670 So.2d 718 (1996)
Robert E. ROWE and Tina Rowe, Plaintiffs-Appellants,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant-Appellee.
No. 95-669.
Court of Appeal of Louisiana, Third Circuit.
March 6, 1996.
Writ Denied May 17, 1996.
*720 Richard Charles Broussard, Lafayette, for Robert E. Rowe and Tina Rowe.
Preston D. Cloyd, Lafayette, for State Farm Mutual Automobile Insurance.
Before KNOLL, COOKS and SAUNDERS, JJ.
*721 SAUNDERS, Judge.
In this action against their UM carrier, plaintiffs Robert and Tina Rowe appeal a jury's failure to award any damages, asserting manifest error in addition to error on the part of the trial court in evidentiary rulings blocking their efforts to discover and present evidence to the jury establishing the extreme bias alleged of defendant's expert witness, Dr. James McDaniel.
Having reviewed the record in extenso, we agree in part with plaintiffs' argument. Specifically, we find that the jury failed to adequately take into account the uncontradicted lay witness testimony as well as the conclusions of plaintiff's treating physicians and reverse the trial court's conclusion that plaintiff failed to legally establish the causal link between Robert's back injuries and the automobile accident giving rise to this litigation. There is no question but that plaintiff sustained objectively identifiable bulging, protruding, or ruptured lumbar discs following the accident in question that he had not before its occurrence. Additionally, the evidence overwhelmingly suggests that plaintiffs medical difficulties have inflicted great physical discomfort upon plaintiff and great strains upon his professional and family lives.
We detect no error on the part of the jury in concluding that plaintiffs neck injuries were not so related, however.
Finally, although our holding with respect to plaintiffs' first assigned error is dispositive, we further conclude that the trial court erred in its evidentiary rulings.

I.
In this suit against his uninsured/underinsured motorist carrier, plaintiff, Robert Rowe, seeks damages for serious neck and back injuries he attributes to a May 23, 1991, automobile accident when his vehicle was rear-ended while stopped at a busy intersection in Lafayette. Plaintiff, Robert Rowe, driving a Chevrolet Suburban, was at a complete stop when his vehicle was struck with such force by an underinsured driver that his driver's seat was thrust backward into a horizontal position, resting against the rear seat.
Although the facts surrounding the accident are undisputed, the defendant contends that plaintiffs injuries were not caused by the automobile accident in question but by events clearly unrelated to the automobile accident, either plaintiffs exertions in moving a chest of drawers on December 22, 1992, or in his handling a light file folder in January 1993.

II.
Plaintiff has the burden of proving causation by a preponderance of the evidence. Morris v. Orleans Parish School Bd., 553 So.2d 427 (La.1989). The plaintiff is aided in discharging this burden by the legal presumption that, "if before the accident the injured was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition." Lucas v. Insurance Company of North America, 342 So.2d 591, 596 (La.1977) (emphasis ours), quoted in Dabog v. Deris, 625 So.2d 492, 494 (La.1993) and Housley v. Cerise, 579 So.2d 973, 980 (La.1991).

III.
Plaintiff maintains that he sustained severe and partially disabling neck and back injuries in the May 23, 1991, accident. Because we find the Lucas rule dispositive, and because the histories associated with plaintiffs neck and back injuries vary greatly, we will review each injury separately.

EVIDENCE AT TRIAL

Neck Injury
Plaintiff maintains that the disc troubles in his neck are attributable to the accident. Defendant disagrees, claiming that plaintiff cannot connect the May 23, 1991 accident to his C5/6 disc troubles. The jury apparently believed the defendant and concluded that plaintiff injured his neck December 22, 1992, when he attempted to move an awkward fifty pound pine chest of drawers.
*722 As defendant correctly observes, other than the soft tissue injury, plaintiff developed no symptoms following the accident at issue until seven months later, when plaintiff injured himself moving furniture on December 22, 1992. This prompted Dr. Anseman in early 1993 to order the MRI which revealed a left paracentral disc protrusion at C5/6.
After reviewing all of the evidence, we cannot say the jury erred. While it is true, as plaintiff suggests, that his neck hurt immediately after the automobile accident, the record shows that plaintiffs neck pains had abated between September 1991 and December 22, 1992, when the furniture moving accident occurred, requiring plaintiff to first see Dr. Anseman for his neck on January 5, 1993.([1])
In short, there was evidence before the jury to furnish a reasonable factual basis for its conclusion that plaintiffs disabling neck difficulties were caused solely by the intervening cause of December 22, 1992 rather than the May 1991 automobile accident. While it is true, as plaintiff suggests, that he had been receiving medical treatment between the date of the accident and December 22, 1992, the record shows that those treatments related to his back and had nothing to do with the conditions or pain in plaintiffs neck, which had abated long before December 22, 1992. Thus, we cannot say the jury erred in concluding that plaintiffs rather severe cervical disc problems did not result from the May 23, 1991 accident. The jury's conclusions were not clearly wrong. Canter v. Koehring, 283 So.2d 716, 724 (La.1973).
Finally, because plaintiffs initial neck pains were not continuous in time or type, the legal presumption articulated in Lucas and applicable in Dabog and Housley is inapplicable with regard to plaintiffs neck injuries.

Back Injury
The evidence compels us to reach a different conclusion with respect to plaintiffs back injury, however.
The causal link connecting Mr. Rowe's back injury to the accident was established by most expert and all fact witness testimony. Causation was even conceded in part by defense counsel in closing arguments.([2])
Defendant maintains that the jury did not err in finding that plaintiff failed to establish the connection between the accident at issue and his back injuries. In making this assertion, defendant has no choice but to rely heavily on the testimony of Dr. James McDaniel, who provided the only support for the notion that plaintiffs back injuries might have been unrelated to the accident. Unlike Mr. Rowe's treating physicians, Dr. James McDaniel was hired only for litigation purposes, saw plaintiff one time, more than three years after the accident occurred, for fifteen or twenty minutes, only three weeks before trial.
Neither defendant's arguments nor Dr. McDaniel's testimony, which had apparently been anticipated by State Farm,([3]) overcomes the legal presumption of Lucas and its progeny. Plaintiffs disc troubles at L 4/5, conclusively established by an MRI conducted March 31, 1992, long before the December 22, 1992 incident described above,([4]) were sufficiently continuous to be legally attributable to the May 23, 1991 accident. The only possible basis for the jury's finding of no legal causation would have been some intervening cause. The record clearly shows that plaintiffs back injury is not attributable to any intervening cause.
*723 Additionally, the trial court erred in rejecting the testimony of plaintiffs treating physicians, two of whom concludedmore probably than not, if not conclusivelythat plaintiff's injuries were attributable to the accident in question.
It is well-settled that the treating physicians' testimony will ordinarily be given greater weight than the testimony of a physician who examines a plaintiff for diagnosis only. Martin v. Travelers Insurance Co., 546 So.2d 958 (La.App. 3rd Cir. 1989); Sepulvado v. Willamette Industries, 459 So.2d 1342 (La.App.3rd Cir.1984).
Chevalier v. L.H. Bossier, Inc., 617 So.2d 1278, 1284 (La.App. 3 Cir.1993).
Consequently, we reverse in part the conclusions of the trial court, both because it failed to apply the Lucas rule and because it failed to take into proper account the testimony of plaintiffs treating physicians. We find plaintiff proved by a clear preponderance of the evidence that his back injuries are attributable to the May 23, 1991 accident.

IV.

Evidentiary Rulings
Finally, plaintiff complains that the trial court erred in denying him the ability to discover and introduce evidence by which plaintiff intended to inform the jury of Dr. McDaniel's apparent bias as an advocate for the insurance industry. Specifically, plaintiff complains of: (1) the trial judge's refusal to permit him to have Dr. McDaniel produce certain financial and medical records; (2) the trial judge's order excluding as evidence of Dr. McDaniel's bias defendant's Motion in Limine filed two months before Dr. McDaniel examined plaintiff or reviewed his medical file; and (3) the trial judge's order excluding the testimony of Mr. Lawrence Curtis, a trial attorney who proffered testimony of Dr. McDaniel's alleged insurance advocacy based on his personal experience.
Plaintiff's argument can best be explained in his own words, which we quote from his brief:
This Honorable Court is equipped with a knowledge of Dr. McDaniel's track record. In a brief review limited to opinions of the Third Circuit we note that Dr. McDaniel's opinions have been reviewed by this Court on at least 27 occasions. In reviewing these cases one cannot fail to recognize Dr. McDaniel's extreme bias against personal injury claimants and in favor of his clients among the insurance industry. These decisions show that Dr. McDaniel consistently testifies that personal injury plaintiffs are not injured or that they are not injured by the accident in question or that they are malingering. In most of these cases this Court rejected Dr. McDaniel's testimony in favor of the testimony of the treating physicians. Since Dr. McDaniel testified against the personal injury claimant and contrary to the treating physician in all 27 of these cases, his lack of objectivity and independence is clear. Nugent v. Continental Cas. Co., 634 So.2d 406 (La.App. 3d Cir.1994); Chevalier v. L.H. Bossier, Inc., 617 So.2d 1278 (La.App. 3d Cir.1993); Landry v. Central Industries, Inc., 592 So.2d 478 (La.App. 3d Cir.1991); Pollock v. Louisiana Ins. Guar. Ass'n, 587 So.2d 823 (La.App. 3d Cir.1991); Fusilier v. Liberty Rice Mill, Inc., 569 So.2d 1050 (La.App. 3d Cir.1990); Broussard v. Grey Wolf Drilling Co., 562 So.2d 1006 (La.App. 3d Cir. 1990); Reese v. Winn-Dixie of Louisiana, Inc., 542 So.2d 68 (La.App. 3d Cir.1989); Daniels v. State, through DHHR, 532 So.2d 218 (La.App. 3d Cir.1988); Ardoin v. Abdalla, 525 So.2d 642 (La.App. 3d Cir. 1988); Thomas v. K-Mart Corporation, 525 So.2d 24 (La.App. 3d Cir.1988); White v. City of Eunice, 512 So.2d 599 (La.App. 3d Cir.1987); Olivier v. Sears Roebuck & Co., 499 So.2d 1058 (La.App. 3d Cir.1986); Saucier v. Winn-Dixie of Louisiana, Inc., 499 So.2d 1033 (La.App. 3d Cir.1986); Notto v. Morton-Norwich Prod., Inc. 498 So.2d 1158 (La.App. 3d Cir.1986); Johnson v. Masur, 493 So.2d 881 (La.App.3d Cir. 1986); Moresi v. Nationwide Mutual Ins. Co., 488 So.2d 1311 (La.App. 3d Cir.1986); Batiste v. Joyce's Supermarket, 488 So.2d 1318 (La.App. 3d Cir.1986); Pepperdine v. South La. Contractors, Inc., 486 So.2d 317 (La.App.3d Cir.1986); Deshotel v. South La. Contractors, Inc., 484 So.2d 155 (La. App. 3d Cir.1986); Richardson v. Continental *724 Ins. Co., 468 So.2d 675 (La.App.3d Cir.1985); Campbell v. Luke Construction Co., 453 So.2d 332 (La.App. 3d Cir.1984), 465 So.2d 688 (La.1985); Dugas v. Mouton, 460 So.2d 739 (La.App. 3d Cir.1984); Clark v. Pernie Bailey Drilling Co., 445 So.2d 183 (La.App. 3d Cir.1984); Hayes v. Hammett Co., 442 So.2d 1277 (La.App. 3d Cir.1983); Knott v. Welltech, Inc. 428 So.2d 1221 (La.App. 3d Cir.1983); Francis v. Manpower, Inc., 411 So.2d 702 (La.App. 3d Cir.1982); Thibodeaux v. Dresser Industries, Inc., 407 So.2d 37 (LaApp. 3d Cir.1981).([5])
Unfortunately the jury did not have the benefit of Dr. McDaniel's history as an advocate for the insurance industry. Perhaps if the trial court had allowed us to present this information to the jury, it could have reached the same opinion of Dr. McDaniel as has been expressed by this Court:
"This court is well aware of Dr. McDaniel's reputation for testimony that often crosses the border into advocacy. See, Chevalier v. L.H. Bossier, Inc., 617 So.2d 1278 (La.App. 3d Cir.1993). By his testimony in the record before us, we see it is a reputation well-deserved. Moreover, his opinion is based on only one examination of Ms. Nugent. For that reason, it is entitled to less weight than that of her treating physicians. Chevalier, supra; Fontenot v. T.L. James & Co., Inc., 563 So.2d 909 (LaApp. 3d Cir. 1990).'

Nugent v. Continental Cas. Co., 634 So.2d 406 (La.App. 3d Cir.1994).([6])
(Notes added).
We find plaintiffs case compelling. The trial judge erred in depriving plaintiff of the right to discover and present evidence of Dr. McDaniel's bias.
Our reversal as to this issue does not rest upon Dr. McDaniel's hard-earned reputation with this court, but rather upon the trial court's misapplication of substantive and procedural law. Procedural rules implement the substantive law and are not an end in themselves. See La.Code Civ.P. art. 5051.
Responding to plaintiffs argument, defendant cites Kem Search, Inc. v. Sheffield, 434 So.2d 1067 (La.1983), for the proposition that the manifest error/clearly wrong standard is ordinarily applicable to our review of a trial judge's rulings. Additionally, defendant cites Lacombe v. Dr. Walter Olin Moss Reg. Hosp., 617 So.2d 612 (La.App.3 Cir.), writ denied, 626 So.2d 1187 (La.1993), and other authority for the proposition that an alleged error warrants reversal on appeal only when the error, when compared to the record as a whole, has a substantial effect on the outcome of the case.
Defendant overlooks the foundation upon which the Kem Search rule is explicitly founded.
It is well settled that reviewing courts will defer to a trial judge's reasonable decision on a question or matter properly within his discretion. It is self-evident, however, that if the trial court's decision was based on its erroneous interpretation or application of law rather than a valid exercise of discretion, such an incorrect decision is not entitled to deference.

Kem Search, Inc. v. Sheffield, at 1071-72 (Emphasis added.)
We have already observed that the trial court erred in failing to apply the Lucas rule which had a substantial effect on this case.
The importance to any litigant of crossexamination of a crucial expert witness cannot be overstated. See generally, Simard and Young, "Daubert's Gatekeeper: The Role of the District Judge in Admitting Expert Testimony," 68 Tul.L.Rev. 1457 (June 1994). The "expert is generally a person of high intelligence, experienced in expressing his ideas persuasively, and extensively more knowledgeable about his field than the crossexaminer." Schmidt, "Cross-Examination of an Expert Witness." 13 Trial 89 (1981). More importantly, in instances where the basis of an expert opinion (whether iterated by a charlatan or a prince) is beyond the common knowledge of the jury, the jury can *725 be deprived of the ability to objectively and rationally evaluate the merit of the expert's opinion. Simard and Young, 68 Tul.L.Rev., at 1460. It is precisely in such instances that a retained expert's "apparent objectivity" can carry "undue weight" with the jury. United States v. Brown, 501 F.2d 146, 149-150 (9th Cir.1974).[7]
Thus, precautions must be taken lest a retained expert's testimony, "dressed up and sanctified as the opinion of an expert," be permitted to unduly influence the jury. Viterbo v. Dow Chemical Co., 826 F.2d 420, at 424.([8]) These precautions include enabling parties litigant to discover an expert's bias by discovery or subpoena, to present evidence of such bias to the trier of fact and, in extreme cases, to have the expert's testimony declared inadmissible.
In Frederick v. Woman's Hospital of Acadiana, 93-187 (La.App. 3 Cir. 11/3/93), 626 So.2d 467, writ denied, 93-2991 (La. 2/4/94), 633 So.2d 169, we had occasion to consider "the point at which a parade of expert witnesses called by one party becomes counterproductive to the necessary twin goals of fairness and judicial economy." Id. In determining the admissibility of expert testimony, we adopted the four step approach articulated in Christophersen v. Allied-Signal Corp., 939 F.2d 1106 (5th Cir.1991) and discussed in Adams v. Chevron U.S.A, Inc., 589 So.2d 1219, 1223 (La.App. 4 Cir.1991), writs denied, 592 So.2d 414, 415 (La.1992):
"The United States Fifth Circuit Court of Appeal has recently interpreted F.R.E. 403, after which the Louisiana rules on expert testimony are patterned. Christophersen v. Allied-Signal Corp., 939 F.2d 1106 (5th Cir.1991). The court delineated the following four inquiries for determining the admissibility of expert testimony: (1) whether the witness is qualified to express an expert opinion, (2) whether the facts upon which the expert relies are the same type as are relied upon by other experts in the field, (3) whether in reaching his conclusion the expert used wellfounded methodology, and (4) assuming the expert's testimony passes these tests, whether the testimony's potential for unfair prejudice substantially outweighs its probative value under the relevant rules. Id. We adopt those standards as appropriate for evaluating the admissibility of expert testimony under Louisiana law."
Frederick v. Woman's Hospital of Acadiana, at 470-471, quoting Adams.
In Frederick we were concerned with cumulative expert testimony, which concerned the fourth inquiry. Unlike Frederick, this dispute summons our consideration of the first three Adams inquiries and the avenues available to a party who wishes to discover and introduce evidence disqualifying or impeaching an adverse expert.
In the case sub judice, plaintiff attempted to introduce the testimony of an eyewitness personally familiar with some 250 of Dr. McDaniel's trial appearances and to subpoena financial records he hoped might establish Dr. McDaniel's bias.([9]) His efforts to do so were denied.
*726 We conclude that, under the circumstances of this case,([10]) the trial judge abused its discretion in so ruling as, within limits, such items are clearly susceptible to subpoena duces tecum.
Discovery of Records:
Art. 1354. Subpoena duces tecum

A subpoena may order a person to appear and/or produce at the trial or hearing, books, papers, documents, or any other tangible things in his possession or under his control, if a reasonably accurate description thereof is given; but the court in which the action is pending in its discretion may vacate or modify the subpoena if it is unreasonable or oppressive.

* * * * * *
La.Code Civ.Pro. art. 1354 (Emphasis ours).
Dr. McDaniel's credibility, like that of any witness, is subject to attack.
Art. 607. Attacking and supporting credibility generally
A. Who may attack credibility. The credibility of a witness may be attacked by any party, including the party calling him.
* * * * * *
C. Attacking credibility intrinsically. Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.

* * * * * *
La.Code Evid. art. 607.([11])
According to Dr. McDaniel's trial testimony, he specializes in orthopedic surgery, yet performs surgery only twice a week, while seeing more than one hundred patients per week and performing six to eight IME's, which he prefers to call "second opinions"; and when asked how much work he did for State Farm and for defense counsel, Dr. McDaniel deflected the question with a shrug. He said:
I don't keep a count of it. I don't pay attention to who requests things. I go in there and examine the patients and render a report. I generally don't notice who is setting up the appointment. My girls in front do that.
Without access to Dr. McDaniel's records, the Rowes were unable to prepare for or offer any meaningful cross-examination to refute Dr. McDaniel's claims of experience or want of prejudice. It is no coincidence that the laws of this state equip the litigant with mighty arsenal, for our Codes of Civil Procedure and Evidence are designed specifically to facilitate the discovery of credible evidence by adversaries, not to deter its location. Plaintiffs inability to obtain, review, and possibly present evidence was antithetical to these objectives and had the effect of limiting plaintiffs to no weapon save cross-examination which, uncomplemented by other discovery methods, seldom is of adequate value when thrust against the broadside of the litigation expert who can so gracefully stiffarm his unprepared cross-examiner.
Subject to the balancing test of La.Code Evid. art. 403, plaintiff should have been permitted to obtain the records sought, as these records were admissible to show Dr. McDaniel's bias. See La.Code Evid. art. 607, *727 Official Comments (k) and (l) and, generally, 1995 Authors' Notes to Article 607.
Proffered Testimony:
Likewise we conclude that the trial court erred with respect to the proffered testimony of Mr. Lawrence Curtis, an attorney, which was offered in support of plaintiffs contention of Dr. McDaniel's long history of bias.
Every person of proper understanding is competent to be a witness, La.Code Evid. art. 601, and nothing in the record suggests that Mr. Curtis was not competent. Mr. Curtis observed and offered a detailed description, based on personal observation, of Dr. McDaniel's testimony in each of the 250 or more cases in which he came into professional contact. In each instance, Dr. McDaniel was retained by a defense interest, performed one physical examination of fifteen or twenty minutes duration, and rendered testimony adverse to the injured party seeking relief from Dr. McDaniel's retainer. Because Mr. Curtis's testimony was based upon his personal knowledge, it did not constitute hearsay and should have been presented to the jury. Art. 602.
Timing of Motion in Limine:
Finally, we turn to the question of whether the trial court erred in denying plaintiff of the opportunity to pursue his line of questioning on the subject of defendant's prematurely filed Motion in Limine. As noted previously, plaintiff had sought to introduce to the jury the fact that this Motion was filed by defendant before Dr. McDaniel had even seen plaintiff or reviewed his history. Plaintiff maintains that this evidence was yet another signal of Dr. McDaniel's bias.
Defendant's Motion in Limine sought to exclude "any and all evidence of Appellate Court opinions which criticize or attack the credibility of Dr. James McDaniel."
While facts disclosed in other proceedings are admissible, trial and appellate courts' opinions as to those facts are not. See, e.g., Reese v. Winn-Dixie of Louisiana, Inc., 542 So.2d 68 (La.App. 3 Cir.), writs denied, 546 So.2d 1218, 1222 (La.1989); Carr v. Fidelity and Casualty Company of New York, 248 So.2d 917 (La.App. 3 Cir.1971). Thus, unless a trial court concludes that an expert's long history of partiality renders his testimony unreasonably prejudicial or useless to the jury, in which case the testimony may be excluded,([12]) it must be admitted, subject to cross-examination. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." See Rock v. Arkansas, 483 U.S. 44, 61, 107 S.Ct. 2704, 2714, 97 L.Ed.2d 37 (1987). Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, ___, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469 (1983).
Another possibility would be to request under LSA-C.E. art. 706 that the trial court appoint an unbiased expert and disclose to the jury the expert's special courtappointed status. This underutilized provision enables litigants of modest means to have the court use its leverage to distinguish court-appointed neutral observers who are beyond reproach from "hired guns" retained by the highest bidder, reducing the perceived need and advantage of litigants to hire the most (and most expensive) experts to counter (or preempt) those that will (or might) be called by their opponents, thus offering parties to judicial proceedings greater assurance that findings of fact are indeed grounded on a reasonable factual basis. *728 Frederick v. Woman's Hospital of Acadiana, 93-187 (La.App. 3 Cir. 11/3/93), 626 So.2d 467, 474; writ denied, 93-2991 (La.2/4/94), 633 So.2d 169.([13])
The trial court correctly concluded that this court's published opinions of Dr. McDaniel are inadmissible, but erred in failing to permit plaintiffs to explore their understandable concerns regarding how its adversary could predict the conclusions of Dr. McDaniel's independent medical examination.
Art. 104. Preliminary questions
A. Questions of admissibility generally. Preliminary questions concerning the competency or qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of Paragraph B. In making its determination it is not bound by the rules of evidence except those with respect to privileges.
B. Relevancy conditioned on fact. Subject to other provisions of this Code, when the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.
C. Hearing of jury. Hearings on matters to be decided by the judge alone shall be conducted out of the hearing of the jury when the interests of justice require. Hearings on the admissibility of confessions or admissions by the accused or evidence allegedly unlawfully obtained shall in all cases be conducted out of the hearing of the jury, but when there has been a ruling prior to trial, it shall not be necessary to conduct another hearing as to admissibility before presentation of the evidence to a jury.
* * * * * *
Art. 105. Limited admissibility
When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly. Failure to restrict the evidence and instruct the jury shall not constitute error absent a request to do so.
La.Code Evid. arts. 104-5.
The trial court should have conducted an in camera hearing to determine whether the motion's timing was admissible. If its prematurity was reflective of no more than a clerical oversight, its timing probably would have been inadmissible as irrelevant or unduly prejudicial. On the other hand, had the trial court concluded that the prematurely filed Motion evidenced a preordained conclusion on Dr. McDaniel's part, Dr. McDaniel's testimony might have been outright inadmissible, or certainly would lay the foundation for allowing plaintiff a more thorough discovery regarding Dr. McDaniel's bias.[14]
As a general rule, the factual basis of an expert's opinion goes to the credibility of the testimony, not its admissibility, and it is up to the opposing party to examine the factual basis of the opinion in cross-examination. Loudermill v. Dow Chemical Co., 863 F.2d 566 (8th Cir.1988). However, if an expert opinion is so fundamentally unsupported that it can offer no assistance to the jury, then the testimony should not be admitted at *729 all. Id., citing Viterbo v. Dow Chemical Co., 826 F.2d 420 (5th Cir.1987).
La.Code Evid. art. 702, like its Federal counterpart, states that expert testimony must be based on "scientific, technical, or other specialized knowledge." Even then, such "testimony must rise to a threshold level of reliability in order to be admissible." State v. Foret, 93-0246 (La. 11/30/93), 628 So.2d 1116, 1123 (adopting Daubert). To be reliable, such testimony requires more than "subjective belief or unsupported speculation," Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, ___, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993), and certainly it requires more than subsidized speculation: "experts whose opinions are available to the highest bidder have no place testifying in a court of law, before a jury, and with the imprimatur of the trial judge's decision that he is an `expert.'" In re Air Crash Disaster at New Orleans, La., 795 F.2d 1230, 1234 (5th Cir.1986). Thus, although a remand is not required in this case in light of our disposition of the merits on other grounds, were this or any court to determine that Dr. McDaniel's opinion was biased in its formation without any support, its unreliability would render it inadmissible. See Viterbo v. Dow Chemical Co., 826 F.2d 420, 423 n. 2; State v. Foret, 628 So.2d 1116.
For the foregoing reasons, the trial court erred in denying plaintiffs the opportunity to obtain record evidence of bias in Dr. McDaniel's possession and to present eyewitness testimony tending to corroborate Dr. McDaniel's asserted history of bias. Subject to an in camera inspection (if necessary), plaintiffs should have been permitted to introduce the evidence to attack Dr. McDaniel's credibility.

V. QUANTUM
Finally, we turn to the quantum issue. The discretion vested in the trier of fact is great, and even vast. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993). A court of appeal may not set aside a trial court's or jury's finding of fact in the absence of manifest error or unless it is clearly wrong, and where two permissible views of the evidence exist, "the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart v. State, 617 So.2d 880, 882-83. Nonetheless, Youn and Stobart did not have as their purpose the "mandate that the trial court's factual determinations cannot ever, or hardly ever be upset," at least where "the trial court verdict was clearly wrong based on the evidence, or clearly without evidentiary support." See generally, Ambrose v. New Orleans Police Amb. Serv., 93-3099, et al., at 7-9 (La. 7/5/94), 639 So.2d 216, 220-222, citing La. Const. art. 5, Sections 5(C) and 10(B) and Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
For the reasons set forth above in Sections I, II, and III, we hold that the jury abused its much discretion in failing to award plaintiffs any general or special damages relating to the back injuries for which defendant is legally answerable, but affirm the trial court's dismissal of plaintiffs' claims with respect to Mr. Rowe's neck injuries. Consequently, having reversed the trial court's legal conclusions with respect to plaintiff's back injuries, we will now fix the quantum. See Courville v. Piggly Wiggly Bunkie Co., 614 So.2d 1366 (La.App. 3 Cir.1993); Guillory v. Keel, 502 So.2d 1159 (La.App. 3 Cir.), writ denied, 505 So.2d 1144 (La.1987).

SPECIAL DAMAGES
Medical Expenses:
A plaintiff ordinarily may recover from the tortfeasor reasonable medical expenses, past and future, which he incurs as a result of an injury. White v. Longanecker, 93-1122 (La.App. 1 Cir.5/23/94); 637 So.2d 1213, 1218, writ denied, 94-1704 (La. 10/7/94); 644 So.2d 640. When incurred in good faith, the victim is entitled to recover the full amount of medical expenses incurred as a result of the accident. Andres v. Liberty Mut. Ins. Co., 568 So.2d 651 (La.App. 3 Cir.1990).
The record clearly establishes that plaintiff is entitled to past medicals incurred to treat his lumbar disc injury. These include the expenses associated with the treatment of plaintiff by Dr. John Humphries and Dr. Stephen Goldware. Dr. Humphries, an *730 orthopedic surgeon, first saw Mr. Rowe September 25, 1991, for the back pains attributable to the automobile accident. Dr. Humphries' care included numerous consultations in addition to prescriptions and orders for pain relieving medications and physical therapy, X-ray tests, and the March 31, 1992, MRI conducted by Laborde Diagnostics that first conclusively established plaintiffs disc herniation, or ruptured disc with defined extruded fragment at L4-5.
Following the MRI's objective evidence, Dr. Humphries referred Mr. Rowe to Dr. Goldware, for whose back-related expenses defendant is also accountable. Dr. Goldware, a neurosurgeon, first saw Mr. Rowe for his back on July 17, 1992, when Dr. Goldware diagnosed a central protruded disc between L4-5. To get a more reliable picture, Dr. Goldware ordered a CT scan which, according to Dr. Goldware, revealed a more serious injury, a ruptured disc. At trial, Dr. Goldware indicated that Mr. Rowe's "significant disc problem" prompted Dr. Goldware to suggest that Mr. Rowe begin to think about having surgery.
We have carefully reviewed the evidence. In responding to defendant's discovery, plaintiff replied with an columnar exhibit listing plaintiff's post-accident medical expenses. The column on the left side listed each medical provider, with post-accident expenses totaling $8,505.26. While much of this amount is attributable to the accident, including Mr. Rowe's back-related expenses and the expenses arising from his soft tissue neck injuries to the extent they were not aggravated by his December 22, 1992 accident, those attributable to Mr. Rowe's neck-related expenses arising from his furniture accident are not included.
Plaintiff, Robert Rowe, also argues that he is entitled to future medical expenses. To recover future medicals, they "must be established with some degree of certainty, and awards will not be made in the absence of medical testimony as to the requirement for such expenses and their probable cost." James v. Webb, 94-162 (La.App. 3 Cir. 10/5/94); 643 So.2d 424, 429, writ denied, 94-2670 (La. 12/16/94); 648 So.2d 396.
At trial, Dr. Stephen Goldware stated that "at age forty (40) years old the chances are overwhelming that [Mr. Rowe] is going to end up getting operated on for his back." Dr. Goldware believed that plaintiffs back surgery "would probably consist of a disc on both sides," taking into account that while the CT scan taken in January 1991 showed the disc "pouched a little more to the right," pressures on the left side were detectable by later pains running down plaintiffs left leg.
According to Dr. Goldware, the total cost of the procedure, including physicians, attendants and hospital fees, would be in the range of $20,000.00-$25,000.00. We believe that a total award of $25,000.00 is sufficient to address plaintiffs past and future medical expenses.

GENERAL DAMAGES
We have reviewed the record and determine that the trial court abused its discretion as to Mr. Rowe's general damages award. Accordingly, we will adjust it. Courville v. Piggly Wiggly Bunkie Co., 614 So.2d 1366; Guillory v. Keel, 502 So.2d 1159.
The record is uncontradicted insofar as it shows that plaintiffs back condition has been particularly troublesome to this victim, who before the accident was an active participant in his profession and community, and with his family. Largely sidelined from each of his principal interests by the accident, Mr. Rowe became uncharacteristically depressed. About the only silver lining that can be detected is that plaintiff has been ordered by one of his physicians to engage in sporadic athletic activities, as his back permits, to strengthen his back and stave off his inevitable back operation. Regrettably, with only a few rare exceptions, Mr. Rowe's back has not permitted him to return to competitive tennis, jogging and other physical activities that marked his very active pre-accident lifestyle. Additionally, Mr. Rowe has been forced to greatly curtail his teaching of bible school and coaching of his children's little league sports teams, and other activities so important to him before the automobile accident. The record shows that his suffering has been extreme.
*731 We find general damages of $250,000.00 should fairly compensate Mr. Rowe for his past and future mental and physical pain and suffering.
Loss of Earning Capacity
Next, we turn to plaintiffs alleged lost earnings. A plaintiff must prove by a preponderance of the evidence that he suffered a loss of earning capacity. Harig v. State of Louisiana, Bd. Of Elem. & Sec. Education, 25,702 (La.App. 2 Cir. 3/30/94); 635 So.2d 485. To do so, he "must present medical evidence which indicates with reasonable certainty that there exists a residual disability causally related to the accident." Aisole v. Dean, 574 So.2d 1248, 1252 (La. 1991). While claims for past lost wages must be established with some degree of certainty, Dupre v. Exxon Pipeline Co., 93-1528 (La. App. 3 Cir. 6/1/94); 638 So.2d 1118, writ denied, 94-2200 (La. 11/18/94); 646 So.2d 379, they need not be proven with mathematical certainty, but only by such proof as reasonably establishes the plaintiff's claim. Veazey v. State Farm Mut. Auto Ins., 587 So.2d 5 (La.App. 3 Cir.1991). This award may be supported by the plaintiffs detailed and uncorroborated testimony. Craig v. Burch, 228 So.2d 723 (La.App. 1 Cir.1969), writ denied, 255 La. 475, 231 So.2d 393 (1970). Additionally, the plaintiffs work experience and earning history is particularly useful in calculating the amount due for loss of income. Morris v. Highlands Ins. Co., 525 So.2d 125 (La.App. 3 Cir.1988).
The record supports that the accident has resulted in Mr. Rowe's loss of income as an experienced and successful tax attorney. The record is uncontradicted that plaintiff was specifically advised to take two months off from work after the accident. Consequently, we conclude that plaintiff is definitely entitled to his net losses occasioned from being unable to bill any hours whatsoever during these two months.
Plaintiff, of course, is also entitled to any partial losses following this period. To establish the magnitude of his financial losses, plaintiff presented, in addition to his own and his wife's testimony, the testimony of Dr. Randy Rice, Ph.D., a Professor of Economics at LSU. His conclusions were principally derived from a comparison by him of Mr. Rowe's 1990, pre-accident, hourly totals and wage rates with the reduced figures Mr. Rowe had in the period between the accident and trial on the merits. Without the benefit of any evidence of its own, defendant has suggested that Dr. Rice's estimates of Mr. Rowe's past and future wage losses were unreliable due to their reliance upon plaintiffs' word and from only his 1990 billable hour and hourly rate figures, rather than from a better cross-section of Mr. Rowe's work history.
We find no basis for rejecting the 1990 basis for estimating Mr. Rowe's wage losses, and cannot, as defendant has afforded this Court with no rebuttal evidence.
To establish his estimate of plaintiffs losses, Dr. Rice, whose expertise was conceded at trial by defendant, researched Mr. Rowe's billable hours from the accident through the first half of 1994 and multiplied those figures by $135.08 an hour to calculate Mr. Rowe's annual earned income. Broken down by year, Dr. Rice's estimates of Mr. Rowe's earnings were: $114,142 in 1990; $108,592 in 1991; $90,740 in 1992; $98,388 in 1993; and $31,678.50 through July 1994.
Comparing the years following Mr. Rowe's accident to his 1990 earnings, Dr. Rice estimated that Mr. Rowe lost some $111,414 through the date of Mr. Rowe's trial on September 15, 1994.
As for future lost wages, Dr. Rice again used Mr. Rowe's 845 billable hours of 1990 as his basis. Against this figure he multiplied Mr. Rowe's $135.08 1990 hourly rate, adding 4% annual increases over Mr. Rowe's 22 year life expectancy, based upon Mr. Rowe's past earnings history. Doing so, the expert calculated that, but for Mr. Rowe's diminished workloads, reduced to present value, Mr. Rowe could have been expected to earn $2,130,627.00. Again, this figure assumed that Mr. Rowe could work 845 billable hours per year.
To determine Mr. Rowe's future lost wages, Dr. Rice subtracted what Mr. Rowe would be able to earn, based on Mr. Rowe's post-accident history of billing 588 hours annually. Dr. Rice projected the present value *732 of Mr. Rowe's post-accident earnings to be $1,482,000, leaving the difference ($2,130,627.00 minus $1,482,000.00) of $648,627.00 to be Dr. Rice's opinion of the present value of Mr. Rowe's lost future earnings for the duration of his life expectancy.
We see no basis for rejecting these, the only reliable estimates of Mr. Rowe's earning losses. We must, however, reduce the $111,414.00 pre-trial and $648,013.00 figures by the amount we find attributable to Mr. Rowe's neck injuries.
While it must be said that part of Mr. Rowe's troubles in sitting for prolonged periods relate to his inability to crane his neck to pore over reading materials placed on his desk, his difficulty in sitting for long periods are mostly attributable to his back problems, which also deny Mr. Rowe the ability of working in a standing position, thereby further reducing whatever already diminished ability Mr. Rowe has.
We conclude that plaintiff's uncontradicted evidence supports an award of $55,707.00 in past wages, including the two month period during which he had no billable hours.
As to his future lost wages, we find $500,000.00 to be a reasonable figure for plaintiffs lost wages attributable to his debilitating back injuries, an amount sufficient to compensate plaintiff not only for his diminished capacity but for his predictable future work stoppages.[15] The fact that there is no way his losses can be precisely defined does not operate to deny plaintiff his due for the losses he has proven. The operation, while inevitable, is not a guaranteed success, and will not make his back as good as new.
Loss of Consortium:
The compensable elements of damage in a loss of consortium claim are loss of society, sex, service, and support. "Society" is broader than loss of sexual relations. It includes general love, companionship, and affection that the spouse loses as a result of the injury. "Support" is the lost family income that would go to support the uninjured spouse. "Service" is the uncompensated work around the house or educational help with the children which will, as a result of the injury, have to be obtained from another source and at some price. Lonthier v. Northwest Ins. Co., 497 So.2d 774 (La.App. 3 Cir.1986).
Although plaintiff really did not present much evidence at trial to support a large award for loss of consortium, there is evidence to suggest that the plaintiffs' marital relations may have suffered and that Mr. Rowe's physical limitations have spilled over onto Ms. Rowe who, like any parent, could use an occasional reprieve. However, the evidence of loss of consortium is minimal. We award $2,250.00.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed in part, reversed in part, and rendered. Subject to a reduction for the sums already paid by the tortfeasor's liability policy, defendant is cast for damages in favor of plaintiff Robert Rowe in the amounts of $25,000.00 total medical expenses, past and future; $55,707.00 for wages lost pre-trial; $500,000.00 in future lost wages (i.e., post-trial); and general damages of $250,000.00, plus legal interest. Furthermore, plaintiff, Tina Rowe, is entitled to relief in the amount of $2,250.00, plus legal interest, less a credit, if any, for any amount previously paid by the tortfeasor's liability insurer.
Costs taxed to defendant, State Farm Mutual Automobile Association.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
NOTES
[1] Plaintiff's neck initially troubled him for two weeks or so, then resolved before becoming tender again briefly a few months later, when plaintiff attempted to play tennis.
[2] Defense counsel suggested $3,000.00 in medicals, $10,000.00 for past physical pain and suffering; $5,000.00 for future mental pain and suffering; and no damages for future physical pain and suffering or for loss of enjoyment of life.
[3] Interestingly, State Farm filed a Motion In Limine seeking to prevent the introduction of certain evidence pertaining to Dr. McDaniel's integrity, and did so even before Dr. McDaniel performed his "independent" medical examination.
[4] Even Dr. McDaniel conceded that a mild right paracentral bulge existed at L 4/5 when radiologist J.J. Laborde, M.D. conducted the March 31, 1992 MRI.
[5] Public domain citations omitted in original.
[6] Id.
[7] Reversed on other grounds, United States v. Nobles, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).
[8] At this point it should be observed that our Louisiana Code of Evidence, unlike its counterpart in the Federal Rules, "expressly authorizes leading questions on direct examination of an expert," Pugh, Force, et al, Art. 702, Author's Note 2, Handbook on Louisiana Evidence Law. (West 1995).
[9] To illustrate Dr. McDaniel's bias, plaintiff sought by subpoena duces tecum the following records from Dr. McDaniel and his office: copies of all narrative reports from IME's performed by Dr. McDaniel for the past three years; financial statements reflecting services provided and income received in connection with IME's and expert testimony; a statement of the dollar amount of income received relating to IME's; a listing of the number of IME's performed by Dr. McDaniel, listed as plaintiff or defense requested; a copy of each report prepared by Dr. McDaniel at the request or in behalf of State Farm and its affiliates, and of any "documents relating to and a listing of all payments made by State Farm Mutual automobile Insurance Company ... for the purpose of providing independent medical examinations, deposition testimony, reports of trial testimony related to independent medical examinations during the last three years."
[10] Dr. McDaniel did not review Mr. Rowe's case until three weeks or so pre-trial. Like the Louisiana Supreme Court in State v. Foret, 628 So.2d 1116, at 1120 (La.1993), we find in this last minute timing "the inherent prejudice of the last minute disclosure ... precluding adequate time to prepare to rebut the expert's testimony." Consequently, we find unconvincing defendant's argument that it was prejudiced by the relative tardiness of plaintiffs' subpoena.
[11] The doctor-patient privilege does not attach since Dr. McDaniel is not plaintiff's treating physician. Compare La.Code Evid. art. 510(A)(1) and (B)(2).
[12] The specific provisions of the Code of Evidence of primary concern here read as follows: Art. 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
Art. 702. Testimony by experts
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
La.Code of Evid. arts. 403, 702.
[13] We hasten to note that while this opinion addresses itself to the admissibility of evidence, nothing said in this opinion should be construed to hamper a litigant's ability to obtain judgment on the merits; should the evidence be admissible, yet insufficient, the court remains free to direct a verdict or grant summary judgment.
[14] Certainly his testimony would have been subject to attack.

* * * * * *
D. Weight and credibility. The preliminary determination by the court that evidence is admissible does not limit the right of a party to introduce evidence relevant to weight or credibility at the trial.
La.Code Evid. art. 104(D). See also La.Code Evid. art. 607, set forth in the body of this opinion.
[15] Notwithstanding the misleading time lag reflected by plaintiff's income history, the evidence, again without effective rebuttal, demonstrates that a considerable period of time must elapse following a work stoppage before plaintiff is able to regain a firm client base, even in relatively prosperous times.