NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-163

BENNIE C. LEWIS

VERSUS

B-N-D GARAGE & TOWING, INC., ET AL.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2007-6695
HONORABLE DAVID ALEXANDER RITCHIE, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE

**********

Court composed of John D. Saunders, Marc T. Amy, and Elizabeth A. Pickett, Judges.

**AFFIRMED.**

**Michael R. Garber**
**Attorney at Law**
**1801 Ryan St.**
**Lake Charles, LA 70601**
**(337) 494-5500**
**Counsel for Defendant/Appellant:**
**B-N-D Garage & Towing, Inc.**
**Donny Wardrup**

**Randall Earl Hart**
**Attorney at Law**
**1301 Common St.**
**Lake Charles, LA 70601**
**(337) 439-2450**
**Counsel for Plaintiff/Appellee:**
**Bennie C. Lewis**

**PICKETT, JUDGE.**

The defendants appeal a judgment that awards the plaintiff damages resulting from the failure of a diesel engine they installed in the plaintiff's vehicle. We affirm.

**FACTS**

In October 2007, Bennie C. Lewis contracted with B-N-D Garage & Towing, Inc. and Donny Wardrup (B-N-D) to replace the diesel engine in his 2005 GMC Turbo Diesel truck, a street sweeper that Mr. Lewis used in his parking-lot-maintenance business. B-N-D installed a remanufactured Isuzu diesel engine ordered from Martin Automotive Group, Inc. (Martin) in the truck, but it did not run properly. Mr. Lewis sued B-N-D and Martin to recover the cost of the engine and other losses he incurred in connection with the engine replacement.

A trial on the merits was held June 17, 2009. Prior to trial, Mr. Lewis released Martin as a defendant in exchange for Martin providing a mechanic with personal knowledge to testify truthfully at trial as to the mechanical failure he observed when he disassembled the engine and an expert witness to provide a truthful opinion as to the cause of the engine's failure.

Due to injuries suffered in an accident, Mr. Lewis was unable to testify at trial. His daughter, Linda Lewis, who assists him in his business, appeared on his behalf at trial. Ms. Lewis testified that Mr. Wardrup told her that he installed the engine and drove it, but the engine "was knocking so bad he had to return to the shop." She further related that Mr. Wardrup told her that he was having a problem timing the engine and that he would have to order a manual on the engine. According to Ms. Lewis, Mr. Wardrup ultimately told Mr. Lewis that the engine was "bad."

1

After being told the engine was bad, Mr. Lewis had the truck towed from B-N-D to Martin. Martin determined through consultation with Isuzu that the timing for the engine had not been properly set, causing the engine to be damaged beyond repair.

Mr. Lewis presented the testimony of a mechanic and an expert witness to prove his claims against the defendants. The mechanic, Jeffery Sonnier, an employee of Martin, testified that he checked the engine after the truck was delivered to Martin. In doing so, he rotated the engine over with a wrench which caused it to make "bad noises." Mr. Sonnier then testified that he turned the engine over with the key switch but turned it off quickly because the "damage was already done." At that point, he removed the cylinder head and found that the pistons were badly damaged and that the cylinder liners were missing.

Mr. Sonnier reported his findings to his supervisor, Walter "Butch" Benoit, the service manager of heavy duty trucks for Martin. Mr. Benoit instructed him to look for the cylinder liners in the base of the engine. Mr. Sonnier then used a drop light to look inside the cylinders for the liners where he saw pieces of the liners on top of the pistons. On closer inspection, he determined that cylinder liners three and four had dropped in the oil pan, cylinder liner two was cracked but intact, and the top half of cylinder liner one was half cracked and fractured. Additionally, he found a fragment of a liner in cylinder one.

During examination by defense counsel and re-examination by Mr. Lewis's counsel, Mr. Sonnier explained that while there is zero tolerance between the top of the pistons and the head of the engine, the liner fragment could have ended up on top

2

of the piston and caused damage to that piston as a result of the liners fragmenting when the engine was still moving through the crankshaft, causing the fragment to "bang the tops of the pistons."

Mr. Benoit was qualified as an expert in root cause analysis of diesel engine failures. He testified that in the course of his role as service manager he performs root cause analysis on a daily basis to determine whether engine failures presented to Martin for repair are under warranty. Prior to trial, he had been qualified as an expert six times.

When traversed regarding his qualifications as an expert, Mr. Benoit was asked whether he turned his root cause investigations over to manufacturers' representatives to determine the cause of the failures based on the information he provided them. He answered, "No," explaining, "I tell them what I am looking at[,] and I tell them what I think our theory is of what happened[,] and they will either agree with me or disagree with me." He further explained that he had seen a failure like the one Mr. Lewis's engine presented but not on an Isuzu engine.

During his testimony, Mr. Benoit explained how a diesel engine works, noting that some engines have cylinder liners, which Mr. Lewis's engine did, and some do not. He continued, relating that it is an industry standard for manufacturers to reassemble a remanufactured engine as though it was new, hooking up fluid, coolant, and oil then test running it before shipping it to a purchaser; the "hang on components," like the "turbo," the fuel pump, the oil pan, and the injectors, are then stripped, and the engine is cleaned and shipped. Mr. Benoit next testified that when

3

a remanufactured engine is installed in a vehicle, it is critical that the engine timing be set.

According to Mr. Benoit, Mr. Sonnier asked him to look at the engine after he had removed the head. Mr. Benoit described what he saw, stating "I hadn't seen that before very often[,] and we don't see pistons that are so beat up and look so out of place in a cylinder wall. It actually looked like they had the wrong size pistons in there."

Mr. Benoit took pictures of the engine, which he typically did with engine failures. He pointed to one of the pictures, noting that it showed "a piece of the cylinder wall [liner] on top of one of the pistons." He explained that the piece of liner was key to determining what caused the engine failure because it made him and Mr. Sonnier realize that liners were not present in two of the other four cylinders. He continued: "Either they had the wrong pistons in there or the liner was missing and that's when the light showed. You can actually see the broken liners further down in there."

Because of the unusual nature of this engine failure, Mr. Benoit testified that he sent the pictures to Isuzu's engineering department. He also explained that his investigation did not reveal a design issue or design feature on the cylinder lines that caused it to be more likely to be damaged if it was timed properly. Counsel for Mr. Lewis then asked Mr. Benoit if he had determined what caused the engine to fail; counsel for the defendants objected on the basis that Mr. Benoit's testimony would be hearsay because that determination was not from his own knowledge but information he obtained from Isuzu. The trial court overruled the objection, noting

4

it was information Mr. Benoit used in forming his opinion.

Mr. Benoit then testified that after reviewing the pictures of the engine, the Isuzu representative told him:

> [T]his is a classic case of mistiming. You'll see it every day. And he explained to me further then that, "Butch, whoever timed the engine didn't time it correctly. Combustion took place on a brittle liner with the piston way far down, too far, way too much combustion chamber, and there's nothing we can do about it."

Mr. Wardrup testified that he has been a diesel mechanic for approximately fifteen years. He denied that he test drove Mr. Lewis's truck, testifying instead that he started the engine in the shop and that it started knocking within one minute of being started. Mr. Wardrup also denied having informed Ms. Lewis that he had a problem with the timing for the engine. He testified that most of the cylinder liners fracture due to the process used to install them.

Mr. Wardrup related that he did not start the engine until he had a manual and that he followed the directions for setting the timing. He stated that he started the engine, and it initially ran fine. However, within one minute of being started, it started knocking at which time he shut if off. The fact that the engine ran fine for one minute indicated to Mr. Wardrup that the timing was properly set. Mr. Wardrup disputed Mr. Sonnier's and Mr. Benoit's testimony that the timing for Mr. Lewis's engine could be set such that it would fail, stating the timing could not be over-adjusted and cause a major catastrophe.

Nelson Quier testified that he was part owner of B-N-D and had been a diesel mechanic for twenty-six years. He testified that he assisted Mr. Wardrup with installing the engine and that they had done everything "exactly according to the

5

book." He disputed that the engine being out of time would have caused the liners to break.

Dale Littlejohn who worked as a diesel mechanic for forty-five years testified for the defendants. He testified that factory defects and something getting on top of the pistons are possible causes of a fractured liner. He also testified that if the timing on an engine is far enough off to cause damage to a liner, the engine would not crank. On cross-examination, Mr. Littlejohn testified that the timing could not be advanced enough to cause the catastrophic damage shown in the pictures of the Mr. Lewis's engine. He further testified that he had not been asked to examine the engine.

Mr. Littlejohn stated that a liner could be fractured by the manufacturer. He was asked what effect a fractured liner from the manufacturer would have on an engine. He explained that the engine "could crank and run a short period of time. Then the heat generated by the fuel burning could increase the fracture and extend it and then a piece [of the liner] break off and then you got damage" shown in the pictures taken by Mr. Sonnier and/or Mr. Benoit.

Mr. Littlejohn gave other explanations for the damage shown in the photographs. When asked if he had an opinion as to what caused the engine to fail, he testified that he could not give an opinion without seeing the head. Later, he again testified that he could not give an opinion on what caused the engine to fail but qualified his answer, stating "other than it was something that quite evidently got in on top of two pistons" and that it was more probable than not an engine defect as opposed to improper workmanship by a mechanic.

At the conclusion of the trial, the trial court ruled in Mr. Lewis's favor, awarding him judgment against B-N-D and Mr. Wardrup in the amount of $32,788.79, plus legal interest from the date of judicial demand and all costs of court.

The defendants appealed the judgment. They now assign two errors with the trial court's judgment: 1) the trial court erred in allowing Mr. Lewis's expert witness to rely on hearsay to form his opinion regarding what caused the engine to fail, and 2) the trial court erred in relying on Mr. Lewis's expert's testimony to find that Mr. Lewis sustained his burden of proof.

### Expert Witness's Opinion

The defendants complain that the trial court committed error when it allowed Mr. Lewis's expert witness to testify what he was told by a representative of Isuzu regarding the cause of the failure of Mr. Lewis' engine because the Isuzu representative's opinion is hearsay. They urge that Mr. Benoit's opinion was "classic hearsay" because it is "the opinion of an unidentified person at Isuzu" who could not be cross-examined at trial. The defendants further urge that the expert witness's opinion is not his own, but the representative's opinion.

Article 702 of the Louisiana Code of Evidence provides for expert testimony when such testimony can assist the trier of fact in understanding the evidence or in determining a fact at issue. Article 703 further provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Comment (d) to Article 703 specifically references inadmissible hearsay, stating that

7

it is allowable if it is reasonably relied upon by experts in forming their opinions. The comment provides that it is for the court to determine whether such hearsay "may be 'reasonably relied upon' in this fashion." La.Code Evid. art. 703, comment (d). Moreover, the fact that an expert's opinion is based on information not personally known to him affects the weight attributed to his opinion, not the admissibility of the opinion. *See Gagnard v. Zurich Am. Ins. Co./Assur. Co. of Am.*, 02-19 (La.App. 3 Cir. 6/12/02), 819 So.2d 489. *See also, State v. Pooler*, 96-1794 (La.App. 1 Cir. 5/9/97), 696 So.2d 22, *writ denied*, 97-1470 (La. 11/14/97), 703 So.2d 1288; *Rowe v. State Farm Mut. Auto. Ins. Co.*, 95-669 (La.App. 3 Cir. 3/6/96), 670 So.2d 718, *writ denied*, 96-824 (La. 5/17/96), 673 So.2d 611.

The trial court overruled the defendant's objection to Mr. Benoit's relating his conversation with the Isuzu representative, noting it was information Mr. Benoit used in forming his opinion. In ruling, the trial court stated:

> Mr. Benoit was recognized by this Court as an expert as he had been recognized in other cases and he does engine failure analysis on these type[s] of engines several times a day and this is what he does. And Isuzu is one of the manufacturers that they deal with on a daily basis that he has to contact on a daily basis in making decisions on engine failure and the cause of the engine failure. . .

The court then noted that the defense could have had an expert witness examine the engine and dispute the theory presented by Mr. Benoit but did not.

We find no error with the trial court's allowing Mr. Benoit to rely on hearsay to form his expert opinion that improper timing caused Mr. Lewis's engine to fail. Accordingly, this assignment of error is without merit

*Burden of Proof*

The defendants next contend that the trial court erred in relying on Mr. Benoit's

8

testimony to find that Mr. Lewis carried his burden of proof because it was based on hearsay. While we have already determined that the trial court did not err in allowing Mr. Benoit to rely on hearsay testimony as the basis for his expert opinion that the defendants' failure to set the timing on the engine properly caused the engine to fail, we address this assignment of error out of an abundance of caution.

Mr. Lewis's evidence consists of: 1) Ms. Lewis's testimony that Mr. Wardrup reported he drove the truck and the engine started knocking so badly he had to return to the shop and that he then had to order a manual on the engine to set the timing and 2) Mr. Benoit's opinion that the timing for the engine not being properly set caused the cylinder liners to be destroyed and the engine to fail. The defendants presented the testimony of the two individuals who installed the engine and Mr. Littlejohn, who all testified that mistiming the engine would not have caused the engine to fail.

Mr. Wardrup's testimony conflicted with Ms. Lewis's testimony. He testified that he did not test drive the truck and did not start the engine until he set the timing according the manufacturer's instructions as provided in its manual. The trial court heard the testimony and assessed the credibility of these witnesses. It may have completely discounted Mr. Wardrup's and Mr. Quier's testimony that the timing was set according the engine manual if it found Ms. Lewis more credible than them. This court cannot disturb a trial court's decision that is based on credibility assessments unless there is objective evidence that renders the testimony unreliable. *Hebert v. Rapides Parish Police Jury*, 06-2001, 06-2164 (La. 4/11/07), 974 So.2d 635.

Additionally, the trial court's reasons indicate that Mr. Littlejohn's failure to examine the engine prior to trial caused the trial court to discount his testimony.

9

Indeed, Mr. Littlejohn testified that he could not give an opinion as to what caused the engine to fail because he had not examined it. Mr. Benoit testified that the engine remained at Martin until shortly before trial and was available for inspection; however, Mr. Littlejohn testified that he had not been asked to examine the engine. We find no error with the trial court's discounting his testimony for that reason.

For these reasons, we also find this assignment of error to have no merit.

## CONCLUSION

The trial court did not err in allowing Mr. Lewis's expert to rely on hearsay in forming his opinion as to what caused Mr. Lewis's engine to fail, nor did it err in finding that Mr. Lewis proved his case by a preponderance of the evidence. Accordingly, the judgment of the trial court is affirmed. All costs are assessed to B-N-D Garage & Towing, Inc. and Donny Wardrup.

**AFFIRMED.**