# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**09-0029**


**SHANNON MENARD ET AL.**

**VERSUS**

**LAFAYETTE INSURANCE COMPANY ET AL.**


************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20022319
HONORABLE GLENNON P. EVERETT, DISTRICT JUDGE

************

**JIMMIE C. PETERS**
**JUDGE**

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, and John D. Saunders
and Jimmie C. Peters, Judges.


**AFFIRMED AS AMENDED.**

**André F. Toce**
**The Toce Firm, A.P.L.C.**
**Post Office Box 158**
**Broussard, LA 70518**
**(337) 233-6818**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Shannon Menard**

**Edward P. Landry**
**David Y. Lamm**
**Landry Watkins Repaske & Breaux**
**Post Office Drawer 12040**
**New Iberia, LA 70562**
**(337) 364-7626**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Lafayette Insurance Company**
    **Prejean Service Company, Inc.**
    **Scott Benjamin Buxton**


**Thomas A. Budetti**
**Attorney at Law**
**556 Jefferson Street, Suite 200A**
**Lafayette, LA 70501**
**(337) 269-9499**
**COUNSEL FOR INTERVENER/APPELLEE:**
    **State Farm Mutual Automobile Insurance Company**

PETERS, J.

The plaintiff in this matter, Shannon Menard, brought suit against Scott Benjamin Buxton; Prejean Service Company, Inc.; and Lafayette Insurance Company to recover for the damages she and her minor daughter, Baili Elizabeth Racca, sustained in an automobile accident. Ms. Menard appeals certain aspects of the jury verdict rendered in her favor and also appeals the trial court's order allowing State Farm Mutual Automobile Insurance Company (State Farm) to withdraw $6,828.45 from the court's registry. For the following reasons, we affirm the jury verdict as amended and affirm the trial court's order in all respects.

## DISCUSSION OF THE RECORD

The May 8, 2001 automobile accident at issue occurred on Louisiana Highway 3095 in Lafayette, Louisiana, when a vehicle driven by Mr. Buxton caused another vehicle to strike the rear of a vehicle driven by Ms. Menard. At the time of the accident, Mr. Buxton was in the course and scope of his employment with Prejean Service Company, Inc. (Prejean). Lafayette Insurance Company insured both Mr. Buxton and Prejean. State Farm, Ms. Menard's automobile insurer, filed a petition of intervention, asserting that it had paid $5,000.00 in medical expenses on behalf of Ms. Menard as a result of the accident and seeking to recover that from the defendants. The parties stipulated that State Farm was subrogated to Ms. Menard's rights against the defendants for the $5,000.00 it paid on her behalf.

The matter came for jury trial on June 23, 2008, but, after selecting and swearing a twelve-person jury panel, the trial court continued the matter to July 22, 2008, because of the illness of the defendant's trial counsel. On July 22, two new jury members were selected[1] to replace two of the jurors who had been selected on

_____

[1] An alternate juror was also selected this day—something not done in the original selection process of June 23.

June 23 but were subsequently released by the trial court. On the next day, the evidentiary phase of the trial began.

Stipulations entered into at trial reduced the litigation to one issue—the amount of recovery to which Ms. Menard and her daughter were entitled. On that issue, the jury returned the following award for Ms. Menard:[2]

| | | | |
|---|---|---|---|
| A. | Physical injury suffered | $ | 21,000.00 |
| B. | Pain and Suffering, both physical and mental | $ | 50,000.00 |
| C. | Permanent disability and/or impairment, if any | $ | — |
| D. | Loss of earnings and/or earning capacity, if any, both past and future | $ | 20,500.00 |
| E. | Medical expenses, both past and future | $ | 185,300.00 |
| F. | Loss of enjoyment of life | $ | 3,200.00 |
| G. | Loss of household services | $ | — |

After the jury's verdict was reduced to judgment, the defendants deposited $427,955.56 into the registry of the court. Thereafter, State Farm sought and received permission from the trial court to withdraw $6,828.45 from the amount deposited. On appeal, Ms. Menard argues that the awards for loss of earnings and/or earning capacity and medical expenses should be increased and that the trial court erred in allowing State Farm to withdraw the $6,828.45.

**OPINION**

***Standard of Review***

Ms. Menard argues on appeal that we should review this matter *de novo* because of "substantial erroneous evidentiary rulings" by the trial court. Specifically, she argues the trial court erred in allowing Dr. David Aiken, the defendant's medical expert, "to offer causation speculation inconsistent" with the supreme court's ruling in *Housley v. Cerise*, 579 So.2d 973 (La.1991); in not empaneling alternate jurors during the June 23, 2008 selection process; in continuing the June 23 trial date

---

[2]The jury's consortium award to the minor child is not at issue in this appeal.

without doing a more complete investigation of the defense counsel's alleged illness; and in releasing two of the jurors from the July 23, 2008 trial after their selection on June 23, 2008.

> It is well-settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine a preponderance of the evidence. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts *de novo*.

*Evans v. Lungrin*, 97-541, 97-577, pp. 6-7 (La. 2/6/98), 708 So.2d 731, 735 (citations omitted).

In considering Ms. Menard's argument concerning the supreme court's ruling in *Housley*, 579 So.2d 973, we find her reliance on that decision to be misplaced. The supreme court recognized in *Housley* that a plaintiff bears the burden of proving, by a preponderance of the evidence, a causal relationship between the injury sustained and the accident that caused the injury. However, at page 980 of its opinion, it quoted with favor the holding in *Lucas v. Insurance Company of North America*, 342 So.2d 591, 596 (La.1977) (citations omitted), wherein it stated:

> A claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.

3

Thus, the *Housley* presumption is not an evidentiary rule that the trial court uses to limit testimony, but a presumption of causation. Whether that presumption applies is a question of fact. *Viviano v. Progressive Sec. Ins. Co.*, 05-125 (La.App. 3 Cir. 1/11/06), 920 So.2d 313, *writ denied*, 06-359 (La. 4/28/06), 927 So.2d 290. It cannot be the basis for a *de novo* review.

Nor do we find that Ms. Menard's arguments concerning the jury selection process would provide her the right to a *de novo* review.

This matter was filed on May 3, 2002, and, after much procedural maneuvering, began as a jury trial on Monday, June 23, 2008. On that day, the litigants selected a twelve-person jury, but selected no alternate jurors. The jurors were sworn, and the presentation of evidence was to begin the next day. However, the next morning, the trial court delayed the beginning of trial after being informed that the defendants' counsel had become ill and would be unable to participate.

The defense counsel's illness persisted and on June 26, 2008, the trial court rescheduled the matter until July 22, 2008. Ms. Menard's counsel objected to the trial court continuing the case, but rejected the trial court's offer to declare a mistrial. When the trial court polled the jury concerning the new date, two jurors stated that they each had committed themselves to family trips during the week of July 22.

Ms. Menard's counsel objected to the trial court releasing the two jurors. In light of Ms. Menard's objection, the trial court offered her a choice: she could either add two jurors to the panel from the venire that would be present on July 22 and immediately proceed to trial, or she could proceed to trial on October 13, 2008, with the twelve jurors already empaneled. The trial court then released the two jurors, gave Ms. Menard until July 22 to decide how she wished to proceed, and tentatively

4

rescheduled the matter for trial on July 22. On July 22, the litigants selected two additional jurors and an alternate and proceeded to trial. Ms. Menard now argues that the trial court's actions denied her the right to have her case tried by a jury of her choice.

In considering the complaints expressed by Ms. Menard concerning the jury selection process, we first recognize that La.Code Civ.P. art. 1769 does not *require* the trial court to empanel alternate jurors. It simply provides that "[t]he court *may* direct that one or more jurors, in addition to the regular panel, be called and empanelled to sit as alternate jurors." (Emphasis added.) While hindsight suggests that alternate jurors would have been helpful in resolving the difficulties caused by the dismissal of the two empaneled jurors, we do not find that the trial court's decision not to provide for alternate jurors was an abuse of the discretion afforded under Article 1769.

Additionally, the grant of the continuance based on the defense counsel's illness does not rise to legal error that requires a *de novo* review. While there was some confusion concerning whether the defendants' trial counsel had been admitted to a hospital when notice was first afforded to the trial court on the morning of June 24, 2008, a handwritten note from his doctor provided later that same day made it clear that he was not in the hospital, but was, in the opinion of the doctor, "unfit for work for at least the next 48 hours." A subsequent minute entry states that the trial court had a telephone conversation with the defendants' trial counsel and was informed that he would be unable to begin the trial on June 25. When the defendants' trial counsel sent word to the trial court on June 26 that he would not be able to proceed, and despite the fact that Ms. Menard's counsel complained to the trial court

5

that the doctor and the defendants' trial counsel were friends and business partners, the trial court announced that it was satisfied with the accuracy of the information provided by the defense counsel and decided to continue the matter. Louisiana Code of Civil Procedure Article 1631(A) provides that "[t]he court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done." We find that the trial court's actions in this respect clearly fall within the authority granted under this article.

Standing alone, the same article, La.Code Civ.P. art. 1631(A), would give the trial court the authority to dismiss the two jurors based on their vacation plans. However, other laws also support the trial court's decision. The jury procedure statutes and articles seem to generally divide the jury selection process into three phases: the pre-trial release phase, the selection phase, and the trial phase.

The pre-trial release phase is governed by the rules found in La.R.S. 13:3042, *et seq*. These rules give the clerk of court and the trial court separate powers with respect to releasing prospective jurors. With regard to the issue before us, La.R.S. 13:3042(B)(2) gives the trial court the power to grant a prospective juror a twenty-four-month waiver of petit jury service for "undue or extreme . . . financial hardship." Louisiana Revised Statutes 13:3042(C) requires that "[a] person asking for a waiver based on a finding of undue or extreme physical or financial hardship shall take all actions necessary to have obtained a ruling on that request by no later than the date on which the individual is scheduled to appear for jury duty." Had the vacation issue arisen before the jury selection process, the trial court could certainly have considered whether cancelling the planned trips constituted an undue or extreme financial

6

hardship. However, the statute does not address the trial court's right to consider hardship cases after the selection process begins.

In the selection phase, La.Code Civ.P. art. 1761 provides, in pertinent part, that "twelve jurors summoned in accordance with law *shall* be chosen by lot to try the issues specified *unless* the parties stipulate that the case *shall* tried by six jurors" and that "[t]he parties *may* stipulate that if one or more jurors die or become disqualified the remaining jurors shall try the issues specified." (Emphasis added.) In this case, the parties did not stipulate that they would go to trial with less than twelve jurors nor that, if a juror should die or become disqualified, they would try the case with less than twelve jurors. Additionally, La.Code Civ.P. art. 1767 provides that "[a]lthough the entire jury may have been accepted and sworn, up to the beginning of the taking of evidence, a juror *may* be challenged for cause by either side *or be excused by the court for cause or by consent of both sides*, and the panel completed in the ordinary course." (Emphasis added.) This simply codifies the right to remove a juror where cause arises after *voir dire*, and/or where all litigants consent. However, the language is permissive and not mandatory.

Once trial begins, La.Code Civ.P. art. 1769(B) provides that jurors who "become unable or disqualified to perform their duties" shall be replaced by alternate jurors. Notably, it does not limit removal to "cause" under La.Code Civ.P. art. 1765, but suggests that someone who becomes "unable" to serve may be removed. Still, it limits that removal to a situation where the juror can be replaced by an alternate juror. Unfortunately, the procedure articles in general are silent concerning situations such as that which is before us.

7

Given this procedural background and the facts before us, we must agree with Ms. Menard that the trial court's reason for excusing the jurors is not a ground acceptable as a challenge for cause under La.Code Civ.P. art. 1765[3] and that she objected to their release. However, as previously stated, the trial court has broad discretionary powers to assure "that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done." La.Code Civ.P. art. 1631(A). We find no abuse of the trial court's use of the power granted by this article. Obviously, the two jurors could not bring their personal problems to the trial court before the selection process as contemplated by La.R.S. 13:3042(C) because the issue did not arise until after they had been selected as jurors and informed that the trial would not begin as anticipated, but at a later date. The jurors did in fact bring their individual situations to the trial court's attention immediately. We do not read La.R.S. 13:3042 as precluding consideration of hardship situations after the jury selection process begins, and we find that the trial court acted in accordance with law.

---

[3]Louisiana Code of Civil Procedure Article 1765 provides:

A juror may be challenged for cause based upon any of the following:

(1) When the juror lacks a qualification required by law;

(2) When the juror has formed an opinion in the case or is not otherwise impartial, the cause of his bias being immaterial;

(3) When the relations whether by blood, marriage, employment, friendship, or enmity between the juror and any party or his attorney are such that it must be reasonably believed that they would influence the juror in coming to a verdict;

(4) When the juror served on a previous jury, which tried the same case or one arising out of the same facts;

(5) When the juror refuses to answer a question on the voir dire examination on the ground that his answer might tend to incriminate him.

Even assuming the trial court erred in the jury selection process—and we do not find that to be the case—any such error cannot be seen to have materially affected the trial's outcome. The supreme court recognized in *Hamilton v. Winder*, 06-994 (La. 6/16/06), 931 So.2d 358, that a plaintiff's right to have his dispute tried by the jury he selected is satisfied when the alternate substituted on the jury is one selected by the parties. Here, the trial court gave each party two peremptory challenges when choosing the two replacement jurors on July 22, 2008. Further, Ms. Menard effectively waived her objections to the trial court's error in releasing the jurors when she declined the trial court's offer of a mistrial and declined the trial court's offer to proceed with the original jury in October of 2008.

Having found no error in the jury selection process, we will review this matter using a manifest error/clearly erroneous analysis.

### *Admissions of Fact Issue*

Ms. Menard asserts that she served the defendants with a request for admissions of fact that was never answered and that the trial court erred in denying her motion to deem her request for admissions admitted. According to Ms. Menard, on May 16, 2008, she served a request for admissions on the defendants; the responses were due on June 2, 2008; and the defendants filed a motion for extension of time to respond to the request for admissions on June 9, 2008.

The trial record contains no document setting forth the specific admissions requests. However, Ms. Menard did raise the issue in open court on the morning of July 22, 2008, and the trial court responded that the stipulation as to liability rendered most of the admissions moot and that the other requests were improper because there

9

was no claim of bad faith on the part of the defendants.[4]  In response, counsel for Ms. Menard stated, "I believe you are correct, Judge, with the exception that the Request for Admissions that the plaintiff had suffered in some degree."  Counsel did not elaborate as to how Ms. Menard had suffered and did not object to the trial court's ruling.  We do not find that this issue, if it still exists, was properly preserved for appeal.  An appellate court must render its judgment based on the record on appeal. La.Code Civ.P. art. 2164.  *See Murray v. Town of Mansura*, 06-355 (La.App. 3 Cir. 9/27/06), 940 So.2d 832, *writ denied*, 06-2949 (La. 2/16/07), *cert denied*, _ U.S. _, 128 S.Ct. 270 (2007).  Because Ms. Menard's request for admissions is not contained in the record, we cannot review this issue.  Furthermore, "[t]o preserve an evidentiary issue for appellate review, it is essential that the complaining party enter a contemporaneous objection to the evidence or testimony, and state the reasons for the objection."  *LaHaye v. Allstate Ins. Co.*, 570 So.2d 460, 466 (La.App. 3 Cir. 1990), *writ denied*, 575 So.2d 391 (La.1991) [citing *Pitts v. Bailes*, 551 So.2d 1363 (La.App. 3 Cir.), *writs denied*, 553 So.2d 860 (La.1989) and 556 So.2d 1262 (La.1990)].  Ms. Menard did not properly preserve this issue by contemporaneous objection.  Thus, it is not now before us, and we decline to consider it.

### *Expert Testimony Issue*

Ms. Menard asserts that the trial court erred in not granting her motion for a *Daubert* [ *v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993)] hearing to determine whether Dr. Aiken should be allowed to qualify as an expert and testify on behalf of the defendants.  Her primary complaint is that the hearing would have shown that Dr. Aiken has "extreme bias against personal injury

---

[4]Although the request for admissions is not in the record, the trial court obviously had access to its content.

10

claimants in favor of his clients among the insurance industry" and that his testimony would not meet the requirements set forth in *Rowe v. State Farm Mutual Automobile Insurance Co.*, 95-669 (La.App. 3 Cir. 3/6/96), 670 So.2d 718, *writ denied*, 96-824 (La. 5/17/96), 673 So.2d 611.

Generally, the trial court has broad discretion in determining "whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert." *Cheairs v. State ex rel. Dep't of Transp. and Dev.*, 03-680, p. 6 (La. 12/3/03), 861 So.2d 536, 541. In *Rowe*, 670 So.2d 718, this court held that an expert's testimony may, in extreme cases, be declared inadmissible in order to prevent a retained expert's testimony from unduly influencing the jury and adopted four questions for determining the admissibility of expert testimony:

> (1) whether the witness is qualified to express an expert opinion, (2) whether the facts upon which the expert relies are the same type as are relied upon by other experts in the field, (3) whether in reaching his conclusion the expert used well-founded methodology, and (4) assuming the expert's testimony passes these tests, whether the testimony's potential for unfair prejudice substantially outweighs its probative value under the relevant rules.

*Id.* at 725 (citations omitted).

In *Daubert*, 509 U.S. 579, the United States Supreme Court was concerned with "determining the admissibility of new techniques as a basis for expert scientific testimony," and the factors set out in *Daubert* are designed to "'assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue.'" *Cheairs,* 861 So.2d at 541 (quoting *State v. Chauvin*, 02-1188, p. 5 (La. 5/20/03), 846 So.2d 697, 701). Although Ms. Menard filed a motion for a *Daubert* hearing to

11

consider whether Dr. Aiken should be allowed to testify,[5] her complaint is not to Dr. Aiken's methodology or some new scientific or medical technique, but rather to Dr. Aiken's impartiality. Thus, the *Daubert* factors are not relevant and no hearing was required.

With regard to her complaint regarding Dr. Aiken's bias and prejudice, Ms. Menard argues that he does not meet the standards set out in *Rowe*, 670 So.2d 718. However, in this matter, and unlike in *Rowe,* the trial court allowed full cross examination of Dr. Aiken's qualifications and possible biases. The jury was afforded a full opportunity to determine the weight that should be given to Dr. Aiken's testimony. Based on our review of the record, we cannot find that the trial court abused its discretion in allowing Dr. Aiken to testify.

### *Medical Expenses Issue*

Ms. Menard argues that the jury erred in awarding her only $185,300.00 for past and future medical expenses. In considering this argument, we first note that a plaintiff bears the burden of proving entitlement to special damages, such as past and future medical expenses, by a preponderance of the evidence, and the jury's award is reviewed pursuant to the manifest error standard of review. *Thibeaux v. Trotter*, 04-482 (La.App. 3 Cir. 9/29/04), 883 So.2d 1128, *writ denied*, 04-2692 (La. 2/18/05), 896 So.2d 31

The record establishes without dispute that Ms. Menard's medical expenses through the trial date totaled $96,926.27. Dr. Scott Gammel, an anesthesiologist with a specialty in the treatment of chronic pain, has been treating Ms. Menard since 2003. He testified that these expenses relate to her treatment in the five years following the

---

[5]Ms. Menard filed her motion in open court on July 22, 2008. The trial court denied the motion that same day.

accident and explained that Ms. Menard had received eight epidural spinal injections, one radiofrequency ablation, and three cervical placed injections in the past five years. He testified that he was treating her for cervical spine injury and lumbar spine injury, including a mild bulging disc at C4-5. According to the doctor, Ms. Menard will need treatment for the rest of her life to control her pain. This will include at least four doctor visits, two six-week sessions of physical therapy, four epidural spinal injections, and one radiofrequency neural ablation per year; an MRI every two years; and a lifetime of medications including Lortab, Percoset, Lydoderm patches, and Ultran gel. Although Dr. Gammel testified that he believed future surgery was a possibility, he could not say that it was probable.

Dr. James A. Pearce, a dentist who specializes in patients with temporomandibular joint disorders (TMJ) and orificial pain and teaches at the Louisiana State University School of Dentistry in New Orleans, Louisiana, testified that he began treating Ms. Menard on October 31, 2001, for TMJ and last saw her professionally in December of 2007, or approximately seven months before the beginning of trial. He testified that her TMJ condition was caused by the accident sued upon and that she will be required to wear a splint for the rest of her life to reduce her pain. According to Dr. Pearce, the splint will have to be replaced every five years.

Dr. Doug Womack, an economist and retired University of Louisiana at Lafayette economics teacher, testified concerning the present-day value of Ms. Menard's future medical needs. He reached his conclusions by assuming a life expectancy of 41.4 years; accepting the testimony of Drs. Gammel and Pearce concerning the need for, and cost of, future care; and assuming that Ms. Menard

would require no surgery in the future. Dr. Womack's initial calculations were based on a phone conversation with Dr. Gammel; Dr. Womack updated and increased his calculations based on Dr. Gammel's testimony at trial. Dr. Womack's initial calculations included an x-ray every three years, at a present-day value of $1,907.00, and referrals to a spine surgeon and a psychologist/psychiatrist every six years, at a present-day value of $3,178.00 each. But at trial, Dr. Gammel testified that although Ms. Menard might need x-rays, "typically that MRI suffices," and his only testimony concerning visits to a surgeon or a psychologist was that such referrals "will probably be required sometime in the future," with no specificity as to how often they might be required. Thus, we do not include Dr. Womack's initial calculations on the present-day value of either the x-rays or the visits to specialists. Dr. Womack's updated calculations of future medical costs based on the category of treatment are as follows:

| Medical treatment | Present-day value |
|---|---|
| office visits with Dr. Gammel | $22,884.00 |
| physical therapy | $228,843.00 |
| pain medication & muscle relaxers | $331,318.00 |
| epidural steroid injections | $785,456.25 |
| radiofrequency neural ablations | $198,650.00 |
| MRI | $57,211.50 |
| office visits with Dr. Pearce | $8,454.00 |
| mouth splints | $9,535.00 |
| **TOTAL** | **$1,642,351.75** |

Although he never examined Ms. Menard,[6] Dr. Aiken disagreed with both Dr. Gammel and Dr. Womack concerning the need for future treatment. According to

---

[6]Dr. Aiken testified that he scheduled two appointments for Ms. Menard, but both were cancelled by her attorney. He testified that he did review the medical records made available to him.

Dr. Aiken, he found nothing in the medical records made available to him to suggest objective evidence of injury. He testified that the bulging disc referred to in the MRI reports was within normal limits for a thirty-five-year-old woman, and, in his opinion, Ms. Menard suffered only soft tissue contusions and sprains in the accident, with full recovery, probably within a few months after the accident. Dr. Aiken voiced no opinion concerning the amount of past medical expenses, but stated that future steroid shots should not be considered because such treatment would cause calcium loss in the bone structure. He also considered the recommendation for future radiofrequency neural ablation treatments to be harmful, but gave no reasons why he thought this.

In evaluating the jury verdict on this issue, we find it to be internally inconsistent. It is clear that the jury rejected Dr. Aiken's opinion that Ms. Menard's injury was minor and should have already resolved itself, but accepted his opinion with regard to the type of future medical treatment she should receive. We reach this conclusion because the difference between the undisputed $96,926.27 in past medical expenses and the $185,300.00 jury award for both past and future medical expenses is $88,373.73. In other words, the jury concluded that Ms. Menard's injuries were sufficiently severe to warrant future care from her treating physicians but, at the same time, tied the hands of those physicians to conduct treatment they deem appropriate.

> It has long been held that, in general, the observations and opinions of the treating physician are to be accorded greater weight than those of a physician who has only seen the party for purposes of rendering an expert opinion concerning the party's condition. "However, the treating physician's testimony is not irrebuttable, as the trier of fact is required to weigh the testimony of all of the medical witnesses." *Freeman v. Rew*, 557 So.2d 748, 751 (La.App. 2nd Cir.1990) (citations omitted), *writ denied*, 563 So.2d 1154 (La.6/01/90). Ultimately, "the weight afforded a treating physician's testimony is largely dependent upon the physician's qualifications and the facts upon which his opinion is based." *Id*. "Thus, reduced to its essentials, the inquiry is whether, based on the totality of the record, the jury was

> manifestly erroneous in accepting the expert testimony presented by defendants over that presented by plaintiff." *Miller v. Clout*, 2003-0091, fn. 3 (La.10/21/03), 857 So.2d 458, 463.

*Freeland v. Bourgeois*, 06-932, p. 31 (La.App. 3 Cir. 1/24/07), 950 So.2d 100, 119-20, *writ denied*, 07-409 (La. 4/5/07), 954 So.2d 144.

Here, because Dr. Aiken never examined Ms. Menard and based his opinion solely on his review of her medical records, Dr. Aiken's opinion is entitled to less weight than that of Dr. Gammel, her treating physician.[7] *See Estate of Chaisson v. Judice Dirt & Sand, Inc.*, 94-393 (La.App. 3 Cir. 11/2/94), 649 So.2d 502. However, even if this jury had given full weight to Dr. Aiken's testimony that some of the future suggested treatments–the radiofrequency neural ablations and the epidural steroid shots–were not necessary, the jury's verdict is still not consistent with the uncontradicted evidence of what the remaining required future medical treatments would cost. In light of this internally inconsistent verdict, we hold that the jury manifestly erred in failing to award the full value of the medical treatment that was established at trial to be medically necessary, and amend the award to include the present-day value of those future treatments.

Ms. Menard and Dr. Gammel both testified that she had not attended the physical therapy sessions that were prescribed for her in the past, so we do not award any costs for physical therapy. We award the costs of the future office visits with Dr. Gammel, the pain medication and muscle relaxers, the epidural steroid injections, the radiofrequency neural ablations, the MRIs, the office visits with Dr. Pearce, and the mouth splints, which total $1,413,508.75. The undisputed past medical expenses

---

[7]We note that Dr. Aiken's testimony that the two appointments for him to examine Ms. Menard were cancelled by her attorney does not affect our application of this general rule, as the defendants could have obtained a court order for a medical examination of Ms. Menard under La.Code Civ.P. art. 1464.

total $96,926.27. Accordingly, we amend the jury award to increase the award of medical expenses, both past and future, from $185,300.00 to $1,510,435.02.

### Wage Loss & Loss of Earning Capacity

Ms. Menard argues that the jury's award of $20,500.00 for past and future lost earnings is an abuse of discretion and that she should be awarded $34,617.00 for past lost wages and between $33,094.00 and $54,431.00 for future lost earning capacity. We review the jury's award for past and future lost wages pursuant to the manifest error standard of review. *Thibeaux*, 883 So.2d 1128.

At the time of the accident, Ms. Menard was working at Howco Company as a clerk, a secretary, and an office manager, earning $12.75 an hour. She had been working there since 1997 or 1998. Ms. Menard testified that immediately after the accident, she missed a week and a half of work, then began working half days while going to the chiropractor. Ms. Menard testified on direct examination that she now misses a few days of work every two months, when she receives her steroid injections for pain. However, on cross-examination, she agreed that she might miss half a day of work every other month to see Dr. Gammel.

Six months after the accident, in November of 2001, Ms. Menard was laid off from her job at Howco Company. She testified that although she was told that she was laid off due to a slowdown in the work force, she supposed that it was because she had missed so much work after the accident. Derek Main, who was Ms. Menard's manager at the time of the accident, testified by video deposition that there was a general layoff at Howco Company, but also that Ms. Menard's having missed so much work was a factor. At the time of trial, Ms. Menard was working full-time at Frederick Machine Shop, earning $17.00 an hour. Kerri Menard, Ms. Menard's

17

sister-in-law, testified that Ms. Menard has had some work loss over the years since the accident, but that at the time of the trial she was working full-time.

Dr. Womack testified that he evaluated the economic loss Ms. Menard suffered as a result of the accident. Ms. Menard informed Dr. Womack that in the seven years since the accident, she had missed 952 hours of work due to the accident. From this, Dr. Womack calculated that she missed an average of 136 hours per year.

In 2000, before the accident, Ms. Menard earned $30,914.00. To calculate what she could have earned had she not been injured, Dr. Womack assumed that she would have earned an additional three percent each year, to keep up with inflation. Thus, according to his calculations, she should have earned $31,841.00 in 2001; $32,797.00 in 2002; $33,781.00 in 2003; $34,794.00 in 2004; $35,838.00 in 2005; $36,913.00 in 2006; and $38,020.00 in 2007. Dr. Womack had Ms. Menard's tax returns, showing her actual earning, for three of the years between the accident and the trial: in 2004, she earned $22,357.00; in 2005, she earned $22,777.00; and in 2007, she earned $37,699.00. For 2004 and 2005, Dr. Womack calculated that her lost wages totaled $12,437.00 and $13,061.00, respectively, based on the difference between what he believed that she could have earned and what she did earn. In 2007, Ms. Menard's actual earnings were only $321.00 less than he thought she could have earned, so he based his calculations of her wage loss on the average numbers of hours she missed work each year due to the accident. For 2001, 2002, 2003, 2006, and 2007, Dr. Womack assumed that her wage loss equaled 136 hours of missed work at $12.50 per hour: $1,700.00 per year. He prorated that same amount for 2008, until the date of trial. Dr. Womack's determination of Ms. Menard's past wage loss totaled $34,617.00.

In calculating Ms. Menard's loss of future earnings, Dr. Womack assumed that she would miss 136 hours of work, or seventeen days, each year for medical appointments and physical therapy. He explained that at $17.00 per hour, she would lose $2,312.00 per year. Dr. Womack testified that if Ms. Menard works until she is 56, the present value of that loss is $33,094.00, while if she works until she is 67, the present value of that loss is $54,431.00.

The jury, considering the evidence, could well have concluded that Ms. Menard's past lost wages amounted to $1,700.00 per year for the past seven years, totaling $11,900.00, and that her future lost wages, due to missing a half-day of work every two months–a total of three days a year–because of her regular doctor's visits, would have a present-day value of $8,600.00. Thus, we cannot find that the jury was manifestly erroneous in its award of $20,500.00 for past and future lost earnings.

### *Withdrawal of Funds from Registry*

On July 2, 2003, State Farm filed a petition of intervention, asserting that it had paid $5,000.00 in medical expenses on behalf of Ms. Menard as a result of the accident and seeking to recover that from the defendants. On June 23, 2008, the parties stipulated that State Farm was subrogated to Ms. Menard's rights against the defendants for the $5,000.00 it paid on her behalf. The final judgment, signed on August 12, 2008, stated that:

> [T]he medical payments lien of intervenor, State Farm Mutual Automobile Insurance Company, in the amount of FIVE THOUSAND AND NO/100 ($5,000.00) DOLLARS be and hereby is recognized and payment of said lien, together with legal interest from date of judicial demand until paid, shall be paid out of the award designated for Plaintiff, Shannon Menard.

On August 26, 2008, the trial court signed an order allowing the defendants to deposit $427,955.56 into the court registry and further ordering that the funds not be

disbursed without a court order.  On September 11, 2008, the trial court entered an order granting State Farm's motion that it be allowed to withdraw $5,000.00, plus legal interest from the date of judicial demand, from the court's registry.  On October 2, 2008, the trial court entered a revised order stating that the amount of legal interest was $1,828.45, and on that same day the Lafayette Clerk of Court issued State Farm a check for $6,828.45.

Ms. Menard argues that the trial court erred in entering a judgment that allowed State Farm to withdraw the $6,828.45, "despite the fact that Menard was not made whole on the Judgment, the case was subject to an appeal that could increase the Judgment above Defendants' policy limits, and State Farm has Uninsured/Underinsured Motorist coverage exposure to Menard." She asks this court to assess State Farm a $5,000.00 statutory penalty under La.R.S. 22:1973(A) for its "bad faith conduct" in withdrawing the money from the court's registry.

Ms. Menard is attempting to assert a claim for uninsured/underinsured motorist coverage against State Farm in its capacity as her automobile insurer.  But State Farm is not a defendant in this action; it is here only as an intervenor.  Ms. Menard cannot raise on appeal a claim that she did not assert in her pleadings against a party she did not name as a defendant.  *See Mestayer v. Cities Serv. Dev. Co.*, 136 So.2d 513 (La.App. 3 Cir. 1961).

## DISPOSITION

For the foregoing reasons, we amend the jury award to increase the award of medical expenses, both past and future, from $185,300.00 to $1,510,435.02.  We assess all costs of this appeal equally between the plaintiff, Shannon Menard, and the defendants, Scott Benjamin Buxton, Prejean Service Company, Inc., and Lafayette

20

Insurance Company.  Because State Farm Automobile Insurance Company's position was unchanged on appeal, we do not assess it with any costs of the appeal.

**AFFIRMED AS AMENDED.**