STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

09-699


JAMES JASON III

VERSUS

LOUISIANA MUNICIPAL RISK
MANAGEMENT AGENCY, ET AL.


************


APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 2007-0355
HONORABLE MARK A. JEANSONNE, DISTRICT JUDGE


************


MICHAEL G. SULLIVAN
JUDGE


************


Court composed of Jimmie C. Peters, Marc T. Amy, and Michael G. Sullivan, Judges.


Amy, J., concurs in part, dissents in part, and assigns written reasons.


AFFIRMED.


Darrel D. Ryland
J. B. Treuting
Wesley Elmer
Danika A. Benjamin
Law Office of Darrel D. Ryland
Post Office Drawer 1469
Marksville, Louisiana  71351
(318) 253-5961
Counsel for Plaintiff/Appellee:
    James Jason III

**Randall B. Keiser**
**D. Heath Trahan**
**Keiser Law Firm, P.L.C.**
**Post Office Box 12358**
**Alexandria, Louisiana  71315**
**(318) 443-6168**
**Counsel for Defendants/Appellants:**
     **Town of Cottonport**
     **James Williams**

**SULLIVAN, Judge.**

Defendants appeal the trial court's determination that Plaintiff suffered a herniated disc at C4-5 in an automobile accident caused by Defendant driver and its awards for loss of earning capacity and general damages. We affirm.

*Facts*

On December 1, 2006, James Jason III was traveling west on Zion Road in Cottonport, Louisiana, when a van owned by the Town of Cottonport and driven by its employee, James Williams, broadsided the vehicle driven by Mr. Jason. Mr. Jason filed suit against Mr. Williams and the Town of Cottonport, seeking damages for injuries he suffered in the accident.

Mr. Jason was twenty-three years old and living with his mother when the accident occurred. He had graduated from high school, but he was not a good student and had repeated the tenth grade. Mr. Jason was employed by Kerotest, a valve manufacturer. He had three wage increases and a promotion after the accident. His positions with Kerotest were very structured and required him to follow detailed, simple instructions. Due to his injuries, Mr. Jason was not able perform all his job duties, and Kerotest had another employee perform tasks that he could not perform. Before working for Kerotest, Mr. Jason had worked bagging groceries, tagging lumber at a lumber yard, and valeting cars. He smokes cigarettes and marijuana and was convicted of possession of cocaine six years before the accident. He has five children for whom he must pay child support.

Mr. Jason testified regarding the pain he suffered due to his injuries and how his injuries affected his ability to work, socialize, and interact and play with his children. After the accident, he worried that his life would not be what it was before

the accident and that he would not be able to enjoy the activities he previously enjoyed like playing with his children and playing sports with his brothers. He also testified that he was afraid he would re-injure himself.

Mr. Jason explained that approximately one hour after the accident, he began experiencing pain in his neck and low back. Later that day, he sought treatment at Bunkie General Hospital's emergency room where he complained of a headache and pain in his neck and lower back. He was diagnosed with muscle spasms in his neck and back. Three days later, he sought treatment from Dr. Bryan McCann, a family medicine physician. Dr. McCann treated Mr. Jason for thirteen months during which Mr. Jason regularly complained of pain in his neck, left shoulder, and back. There were occasions, however, when he complained only of neck pain. In August 2007, Dr. McCann ordered MRIs of Mr. Jason's neck and back, which were interpreted as normal by Dr. J. J. Laborde, a radiologist. About two months later, Dr. McCann referred Mr. Jason to Dr. George R. Williams, an orthopedic surgeon who limits his practice to treating the spine, because although the MRIs were interpreted as normal, his treatment of oral pain relievers and intramuscular steroid injections had provided Mr. Jason little relief.

Dr. Williams saw Mr. Jason on January 24, 2008. On examination, Mr. Jason complained of neck pain, left shoulder pain, and lower back pain. Mr. Jason noted on his patient intake sheet that he also had shooting pain from his neck down into his arms and legs. After examining Mr. Jason and reviewing his MRIs, Dr. Williams diagnosed him as having a disc herniation at C4-5 that was central and effacing his left C5 nerve root, and he recommended surgery. He related the herniation and nerve root impingement to the accident. Mr. Jason returned to Dr. Williams on two

2

occasions before surgery was performed on April 4, 2008. He complained of neck pain and back pain that went into his left leg, as well as pain radiating down his left arm to his hand, during each of those visits.

In light of Dr. Laborde's interpretation of the MRIs as normal, Defendants had Dr. Louis J. Blanda, also an orthopedic surgeon, conduct an independent medical examination of Mr. Jason. After examining Mr. Jason and reviewing the MRIs, Dr. Blanda agreed with Dr. Laborde's interpretation that they were normal. Defendants then sought an opinion from Dr. Curtis Partington, a diagnostic radiologist with subspecialty training in neuroradiology. Dr. Partington agreed with Dr. Laborde and Dr. Blanda that the cervical MRIs were normal.

Dr. Williams performed an anterior cervical decompression and fusion at C4-5 on Mr. Jason on April 4, 2008. He testified that when he performed the surgery, he "totally visualized the disc herniation, saw the compression of the nerve root, removed it and decompressed the spinal cord, decompressed the nerve root and made sure it was wide open." According to Dr. Williams, Mr. Jason tolerated the surgery well. As of November 2008, he had some lingering intermittent neck pain, but his left arm and shoulder pain had resolved. A CT scan performed in September 2008 revealed that one-sixth of Mr. Jason's fusion was consolidated. Dr. Williams testified that Mr. Jason had not reached maximum medical improvement (MMI), but he anticipated that Mr. Jason would reach MMI approximately one year after surgery or April 2009. He assigned Mr. Jason a 7% permanent partial impairment of the whole body because of the surgery.

Mr. Jason was restricted from work until June 30, 2008, and has been limited to light-duty work status. Dr. Williams testified that light duty consists of avoiding

3

a lot of bending, twisting, or lifting and not picking up more than twenty pounds. Kerotest has accommodated Mr. Jason's inability to perform all the duties of his current position by having another employee lift anything which exceeds the twenty-pound weight limitation imposed by Dr. Williams.

Approximately two and one-half months after surgery, Mr. Jason returned to Dr. McCann complaining of depression and crying spells. Dr. McCann prescribed Cymbalta and Lexapro. These medications did not relieve Mr. Jason's symptoms, and Dr. McCann referred him to Dr. James W. Quillin, a medical psychologist. In Dr. McCann's opinion, Mr. Jason is not a malingerer.

Dr. Quillin practices neuropsychology, clinical psychology, and medical psychology. He first saw Mr. Jason on June 27, 2008. On examination, Mr. Jason showed some mild depression, anxiety, and blunted affect, but he was not psychotic. He related to Dr. Quillin that he feared he might reinjure himself and that he wanted his life to get back to "normal." Dr. Quillin diagnosed Mr. Jason with mild reactive depression and anxiety, which he attributed to Mr. Jason's adjusting to his injury. He also prescribed Cymbalta but adjusted the dosage. Dr. Quillin thought that Mr. Jason was below normal intellect.

Mr. Jason's depression and anxiety improved with Dr. Quillin's treatment, and Dr. Quillin expected him to reach MMI shortly after trial. He anticipated that he would need to see Mr. Jason again in six months, then once a year for two years with a tapering off of the Cymbalta unless needed for anxiety, depression, or pain. Dr. Quillin believed that Mr. Jason was a chronic pain patient but that he did not magnify his degree of distress and was adjusting very well to his situation.

4

Mr. Jason was evaluated by two vocational rehabilitation counselors. Dr. Richard H. Galloway, Mr. Jason's expert counselor, administered the Slosson Intelligence Test R3 and testified that Mr. Jason's total standard score was 67, which is low. Because of Mr. Jason's intellectual abilities and his lack of academic skills, Dr. Galloway opined that the number of jobs available that Mr. Jason could perform was very limited. He further opined that Mr. Jason's cervical surgery had negatively impacted his limited opportunities in the job market.

Dr. Steven Henry Deist, Defendants' expert, did not attempt to determine whether any jobs available to Mr. Jason before the accident had been eliminated because of his injuries and surgery. Instead, he determined that because Mr. Jason returned to work after the accident, his potential future employment had not been affected by his injuries.

The trial court considered the positive, as well as the negative, aspects of Mr. Jason when awarding him damages. It was impressed with Mr. Jason's "veracity" and accepted his experts' opinions over Defendants' experts' opinions. Prior to trial, the parties stipulated that Mr. Jason's recovery could not exceed $500,000.00. The trial court awarded damages totaling $494,684.12, which included $400,000.00 in general damages and $30,000.00 for loss of earning capacity. Defendants appeal and assign three errors with the trial court's judgment.

### *Issues*

Defendants' appeal presents three issues for our review:

1. Is Dr. Williams' opinion that the accident caused a herniated disc at C4-5 contradicted by MRIs, rendering the trial court's acceptance of his opinion error which requires reversal?

2.    Is the trial court's award for loss of earning capacity unsubstantiated by the evidence, warranting reversal?

3.    Is the trial court's award for general damages so high that it is an abuse of discretion under the facts of this case?

### *Discussion*

### *Was the trial court's acceptance of Mr. Jason's physician's opinion error?*

Defendants point to Mr. Jason's MRIs and the three interpretations that no MRI reveals a herniation at C4-5 and claim that the surgery performed by Dr. Williams is not causally related to Mr. Jason's accident. They contend that the trial court's acceptance of Dr. Williams' opinion that an MRI shows a herniation is manifestly erroneous and argue "if a plainly normal MRI . . . confirmed by two physicians specializing in radiology, does not suffice to prove otherwise, then there can really never be any meaningful appellate factual review of palpably erroneous medical diagnoses."

In *Ryan v. Zurich American Insurance Co.*, 07-2312, p. 12 (La. 7/1/08), 988 So.2d 214, 222, the supreme court reiterated the standard for appellate review of the fact finder's acceptance of one expert's opinion over that of another, stating:

> "The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound." *Sportsman Store of Lake Charles, Inc. v. Sonitrol Sec. Systems of Calcasieu, Inc.*, 99-0201 (La.10/19/99), 748 So.2d 417, 421 (citing *Lirette v. State Farm Ins. Co.*, 563 So.2d 850, 853 (La.1990)). "A fact finder may accept or reject the opinion expressed by an expert, in whole or in part." *Green [v. K-Mart*, 03-2495 (La. 5/25/04), 874 So.2d 838] (citing *Lirette, supra* ). "The trier of fact may substitute common sense and judgment for that of an expert witness when such a substitution appears warranted on the record as a whole." *Id.* (Citing *Sportsman Store, supra*). Upon review, "[w]here documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact-finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination." *Sportsman Store, supra* at 421.

"But where such factors are not present, and a fact-finder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." *Id.*

The trial court afforded greater weight to Dr. Williams' testimony because he was Mr. Jason's treating physician and accepted his opinion that the injuries suffered by Mr. Jason in the accident included a herniation at C4-5 and resulting nerve root impingement. This court reviewed the jurisprudential rule which accords greater weight to a treating physician's opinion than to a physician who did not treat the party at issue in *Freeland v. Bourgeois*, 06-932, p. 31 (La.App. 3 Cir. 1/24/07), 950 So.2d 100, 119-20, *writ denied*, 07-409 (La. 4/5/07), 954 So.2d 144, explaining:

> It has long been held that, in general, the observations and opinions of the treating physician are to be accorded greater weight than those of a physician who has only seen the party for purposes of rendering an expert opinion concerning the party's condition. "However, the treating physician's testimony is not irrebuttable, as the trier of fact is required to weigh the testimony of all of the medical witnesses." *Freeman v. Rew*, 557 So.2d 748, 751 (La.App. 2nd Cir.1990) (citations omitted), *writ denied*, 563 So.2d 1154 (La.6/01/90). Ultimately, "the weight afforded a treating physician's testimony is largely dependent upon the physician's qualifications and the facts upon which his opinion is based." *Id.* "Thus, reduced to its essentials, the inquiry is whether, based on the totality of the record, the jury was manifestly erroneous in accepting the expert testimony presented by defendants over that presented by plaintiff." *Miller v. Clout,* 2003-0091, fn. 3 (La.10/21/03), 857 So.2d 458, 463.

Defendants contend that Dr. Williams should not be considered a treating physician because he diagnosed Mr. Jason's herniated disc on his first visit. Mr. Jason was referred to Dr. Williams by Dr. McCann for treatment, Dr. Williams saw him on three occasions before he performed surgery, and Mr. Jason's complaints were consistent with complaints he had made to Dr. McCann. For these reasons, we find no error with the trial court's consideration of Dr. Williams as Mr. Jason's treating physician.

7

Dr. Blanda testified that he did not see a herniation at C4-5 on the MRIs and concluded that the MRIs were normal, even after reviewing a segment marked by Dr. Williams on one MRI which identified the herniation he visualized. Dr. Blanda further testified that based on his examination of Mr. Jason and the marked MRI, he would not have operated on Mr. Jason. Instead, he would have ordered additional tests if he felt Mr. Jason's subjective complaints warranted them. Dr. Blanda did admit, however, that "[s]ometimes [a herniation is] there and you miss it." He also testified that the reliability of MRIs is 90% to 95%.

Dr. Partington testified that the abnormality at C4-5, which Dr. Williams believed was a herniation, was not real but an artifact caused by motion of the spinal fluid. According to Dr. Partington, the artifact appeared only on the axial views (top to bottom) of Mr. Jason's spine, and the artifact would have to appear on the axial views *and* the sagittal (side profile) views for it to be real. Dr. Partington admitted that "very rarely" a flow-related artifact can obscure a disc herniation but qualified that admission, stating, "most of us that see a lot of these are really used to seeing that artifact[,] so it really doesn't mask things very much." Dr. Partington was questioned about false negatives and false positives on MRIs. He did not know statistics for either but believed the number for both is "tiny" or "small."

Dr. Williams testified regarding his opinion that a herniation existed at C4-5 and his findings when he performed surgery. He explained that Mr. Jason's symptoms were compatible with a herniation at C4-5 and that he disagreed with the opinions of Drs. Laborde, Blanda, and Partington. He testified that a herniation may or may not be seen on MRI depending on whether it is a mechanical disc or a chemical disc.

8

We have carefully considered the evidence and cannot say that the trial court's acceptance of Dr. Williams' testimony over Dr. Blanda's and Dr. Partington's was manifestly erroneous. Dr. Blanda's testimony and Dr. Partington's testimony established that MRIs are not 100% accurate. While false positive rates for MRIs may be "small" and even "tiny," the evidence does not establish that Dr. Williams' interpretation of Mr. Jason's MRI was conclusively wrong. Mr. Jason's complaints to Drs. McCann and Williams are indicative of a herniation at C4-5, and the surgery provided him relief from his pain. Furthermore, Mr. Jason is aided in establishing his claim by a presumption of causation because the evidence establishes that he was in good health before the accident, but after the accident he began experiencing symptoms indicative of a disc herniation that "continuously manifest[ed] themselves afterwards" and "the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition." *Menard v. Lafayette Ins. Co.*, 09-29, p. 3 (La.App. 3 Cir. 6/3/09), 13 So.3d 794, 799 (quoting *Lucas v. Ins. Co. of N.A.*, 342 So.2d 591, 596 (La.1977) (citations omitted)).

Dr. Williams testified that he visualized the herniation and nerve root impingement he diagnosed after reviewing Mr. Jason's MRIs when he performed surgery on Mr. Jason. Defendants contend that the herniation and nerve root impingement he visualized must have occurred between the August 2007 MRIs and the April 2008 surgery. After Mr. Jason established that the presumption of causation was applicable to him, Defendants had the burden of proving that another specific incident caused his cervical injury. *Viviano v. Progressive Sec. Ins. Co.*, 05-125 (La.App. 3 Cir. 1/11/06), 920 So.2d 313, *writ denied*, 06-359 (La. 4/28/09), 927 So.2d 290. Defendants did not present any such evidence.

Defendants cite seven cases as support for their contention that Dr. Williams' opinion should be rejected. We have reviewed these cases and find they do not support Defendants' position. In the cases cited, the courts were reviewing administrative body determinations that a treating physician's opinion was insufficient to establish disability or causation because MRIs, and in some cases additional medical evidence, did not substantiate the treating physicians' opinions. The standard of review was similar to the standard of review we must apply, but in reverse. That is, the standard of review was whether there was sufficient evidence to support the agency's decision to give less weight to the treating physician's opinion, even if the reviewing court "might have decided the case differently based on substantial evidence to the contrary." *Sanders v. Comm'r of Soc. Sec.,* 66 Fed.Appx. 551, 553 (6th Cir. 2003). However, the standard of review herein is whether the trial court's decision to give more weight to Dr. Williams' opinion was "reasonable." *Stobart v. State, through Dep't of Transp. & Dev.*, 617 So.2d 880, 882 (La.1993).

Defendants also cite *Cole v. State, Department of Public Safety and Corrections*, 01-2123 (La. 9/4/02), 825 So.2d 1134, where several doctors diagnosed the plaintiff with a traumatic brain injury, but neither the facts, as related by the plaintiff to his treating physicians, nor the objective medical evidence supported that diagnosis. The plaintiff did not relate to his treating physicians that he suffered a blow to his head or complain of headaches until six months after the incident at issue. The supreme court reversed the lower courts' conclusions that the plaintiff suffered a serious closed-head trauma. The reversal was determined to be warranted because the diagnosis was based solely on the plaintiff's history of the incident and his

complaints, which changed during the course of his treatment and were found to be exaggerated by his treating physicians. That is not the situation here.

These cases do not change our determination that the trial court's acceptance of Dr. Williams' opinion was reasonable under the facts presented herein and, therefore, not manifestly erroneous.

### Are the trial court's damage awards manifestly erroneous?

Damage awards are findings of fact which can be disturbed on review only if the fact finder abused its discretion in making the awards. *Guillory v. Lee*, 09-75 (La. 6/26/09), 16 So.3d 1104. The trial court was vested with "great . . . even vast" discretion in awarding damages to Mr. Jason. *Id.* at 1117. Therefore, its awards are entitled to great weight and should only rarely be reversed. *Id.* In determining whether an abuse of discretion has been shown, the relevant evidence must be viewed in the light which offers the most support to the trial court's judgment, and if a reasonable factual basis exists for the trial court's damage awards, we cannot reverse the awards. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994).

#### Is the trial court's award for loss of earning capacity substantiated by the evidence?

Defendants assign error with the trial court's award of $30,000.00 for loss of earning capacity because Mr. Jason received two promotions and three wage increases after the accident. They also assert that the evidence does not establish that his earning capacity was reduced as a result of the accident and that the award "appears to have been arbitrarily arrived at."

11

The supreme court reviewed the law on loss of earning capacity in *Ryan*, 988 at 219, quoting its earlier explanation of this element of damages in *Folse v. Fakouri*, 371 So.2d 1120, 1124 (La.1979):

> Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.

The trial court determined that while Mr. Jason had done well with Kerotest since his accident, his injuries and subsequent fusion have negatively impacted his ability to obtain other employment. In reaching this determination, the trial court considered Mr. Jason's education, academic abilities, prior criminal history, and employment with Kerotest. This conclusion is supported by the testimonies of Mr. Jason's treating physicians and Dr. Galloway. We cannot reverse the trial court's award for loss of earning capacity unless it is manifestly erroneous. The record does not establish that it is.

Defendants also argue that because no expert testified Mr. Jason's loss of future earning capacity is equal to the sum of $30,000.00, the trial court's award of that amount was arbitrary and error. This argument does not recognize that loss of earning capacity is speculative in nature, *Callihan v. Town of Vinton*, 95-665, (La.App. 3 Cir. 12/6/95), 668 So.2d 735, and that the trial court's award is lower than what Mr. Jason's economist calculated because of the $500,000.00 stipulated limitation on Mr. Jason's recovery.

### *Is the trial court's general damage award excessive?*

Defendants contend the trial court's award of $400,000.00 in general damages is excessive in light of Mr. Jason's ability to tolerate work until Dr. Williams

12

performed surgery in April 2008, his return to work only three months after his surgery, his ability to perform essentially the same duties on returning to work, and the possibility of his being able to return to heavy-duty work status one year after his surgery. Defendants' arguments do not acknowledge that Mr. Jason also suffered depression and anxiety because of the accident and his injuries, that Kerotest accommodated his limitations when he returned to work, and that the full impact of his surgery is not yet known.

The trial court refused to penalize Mr. Jason for working and was impressed by his work ethic. It found him credible and accepted his testimony regarding the pain he experienced after the accident. The trial court also believed his testimony that he continues to have pain in his neck, which limits his ability to do his work at Kerotest, and that he is concerned about his job security, re-injuring himself, and whether his life will return to normal. While this award may be more than this court would award, we cannot say that it is an abuse of the trial court's vast discretion in awarding damages.

### *Disposition*

The judgment of the trial court is affirmed. Costs are assessed to Defendants.

**AFFIRMED.**

NUMBER 09-699

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

JAMES JASON, III

VERSUS

LOUISIANA MUNICIPAL RISK MANAGEMENT AGENCY, ET AL.

AMY, J., concurring in part, dissenting in part.

I respectfully dissent from that portion of the majority opinion affirming the quantum of general damages. In my opinion, the underlying factual basis does not support the trial court's award of $400,000 and is, therefore, an abuse of discretion. I would lower the quantum to the highest point at which damages are reasonable in accordance with *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993).

I concur in the remainder of the majority opinion.